**Leonardo E. ZANDERS, Appellant,**

and

**Stanley D. Harris, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 91–CF–1394, 91–CF–1465
and 94–CO–1558.**

District of Columbia Court of Appeals.

Argued March 4, 1996.

Decided June 20, 1996.

Walter S. Booth, Bethesda, MD, appointed by this court, for appellant, Zanders.

Mack E. Davis, appointed by this court, for appellant, Harris.

Thomas J. Tourish, Jr., Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and June M. Jeffries, Assistant United States Attorneys, were on the brief, for appellee.

Before KING, and RUIZ, and REID, Associate Judges.

REID, Associate Judge:

After a jury trial in October 1991, appellants Leonardo Zanders and Stanley Harris were convicted of: (1) robbery, in violation of D.C.Code § 22–2901 (1989 Repl.); (2) robbery of a senior citizen, in violation of D.C.Code § 22–3901(a) (1989 Repl.); (3) credit card fraud, in violation of D.C.Code § 22–3823(d)(2) (1989 Repl.); (4) one count each of forgery and uttering, in violation of D.C.Code §§ 22–3841 (1989 Repl.) and 3842(b) (1989 Repl.); and (5) first degree theft, in violation of D.C.Code, §§ 22–3811 (1989 Repl.) and 3812(a) (1989 Repl.). Zanders was sentenced to consecutive terms of six to eighteen years for robbery of a senior citizen, three to nine years for robbery, one year for credit card fraud, two to six years for first degree theft, and one to three years each for forgery and uttering (both sentences to run concurrently). Harris received the same sentences, except that with respect to credit card fraud a term of four months to one year was imposed. Zanders and Harris filed timely appeals.

Harris contends that: (1) "the evidence was constitutionally insufficient to support [his] convictions"; (2) his legal representation was constitutionally deficient under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and (3) the show-up identification violated his due process rights because it was impermissibly suggestive and unreliable. Zanders contends that: (1) the trial court erred in denying his motion for judgment of acquittal based on the insufficiency of the evidence against him; (2) a variance between the indictment and the government's proof at trial violated his due process rights; and (3) prosecutorial impropriety "substantially prejudiced [his] right to a fair trial." We conclude that the evidence was insufficient to support Zanders' and Harris' convictions for robbery and robbery of a senior citizen; but that the evidence was sufficient to sustain their convictions for first degree theft, credit card fraud, and forgery and uttering. Moreover, we reject Harris' contentions relating to his legal

representation and the show-up identification. Similarly, we reject Zanders' variance and prosecutorial impropriety arguments.

## FACTUAL SUMMARY

On October 20, 1990, seventy-nine year old Dr. Raymond Sokolov took the Metro subway en route to a medical meeting near the Foggy Bottom Metro station. While he was descending the escalator at the Metro Center station to change trains to get to the Foggy Bottom station, he encountered a young man at the bottom of the escalator who had dropped several items and who was blocking egress in the process of picking them up. Persons on the escalator behind Dr. Sokolov began to pile up behind him and put pressure on his back. The young man gathered all the items, walked off and joined a friend. When Dr. Sokolov reached the Foggy Bottom station exit, he discovered that his wallet was missing. After reporting the loss, he concluded that his pocket had been picked during the encounter on the escalator at Metro Center. Dr. Sokolov was wearing a buttoned and belted trench coat which had a vent or a slit in the back. He testified that his wallet was in his left side pocket.[1] Among the items in his wallet was a Visa credit card, and between $200 and $300 in cash.

Dr. Sokolov described the young man at the bottom of the Metro Center escalator as tall, about five feet ten inches to six feet; neatly dressed in casual clothing; between the ages of twenty and thirty, and African American. The young man never touched him and he did not get a good look at him. Dr. Sokolov was not asked to provide an in court identification of either Zanders or Harris. However, he was asked whether he had given permission to either Zanders or Harris to use his credit card. He replied "no." The Metro Transit police officer who took the report from Dr. Sokolov, Officer Gregory Novotny, testified at trial that Dr. Sokolov had described the young man as a Black

---

1. There is some confusion in the transcript of Dr. Sokolov's testimony as to whether the wallet was in the left side pocket or the left hip pocket. Dr. Sokolov stated that he did not use the term "hip pocket," but there was no clarification as to whether his wallet was actually in the left side pocket or the back left pocket of his pants.

male, five feet ten inches, slender, and had provided no clothing description. Dr. Sokolov described the person who walked off with the young man only as a Black male. According to his testimony, Dr. Sokolov took the subway sometime between 8:30 and 9:00 a.m.[2]

At 8:24 a.m., a gentleman registered as Raymond Sokolov at the Holiday Inn, Crown Plaza located at 775 12th Street, N.W. in proximity to the Metro Center subway station. He indicated that the room was for two persons, and was assigned to room 1429. Pamela Saunders, a front desk clerk who did not register the gentleman but who was at the desk during registration, testified that three Black males of average height came into the hotel. One approached the desk to register, and two others sat in the north lobby. She noticed that one of the men sitting in the lobby had on glasses and wore jeans. She could not describe the person who registered in any detail.

Later Ms. Saunders identified Harris during a show-up as one of the men who sat in the north lobby. She made her identification from a window in the hotel's security office while Harris was standing outside at the back of the hotel. She also made an in court identification of Harris. However, she never identified Zanders.

Around 8:30 a.m. on October 20, 1990, two males walked into the Lincoln Gift Shop, located in the lobby of the Holiday Inn, Crown Plaza and owned by Chandra Kant Nandwani. Mr. Nandwani described the two as Black males, between the ages of twenty-two and twenty-five. They wore a "blue jeans jacket." The two men bought toothpaste, tooth brushes and five Georgetown sweatshirts for a total purchase of $135.60. One man signed the credit card slip as Raymond Sokolov. Five to ten minutes later, around 8:45 a.m., four males came into Mr. Nandwani's gift shop. Two were the same two who had been in earlier. The two who had not been in before were described as Black males who wore casual clothes. Three of the men picked out gold jewelry worth a

total of $1,000; they paid for the jewelry with the same credit card used earlier. When the men discovered that they had purchased ladies' rather than men's jewelry, they exchanged the items for an eight inch gold link bracelet and two twenty inch gold chains.

Between 9:00 a.m. and 9:15 a.m., Mr. Nandwani became suspicious and reported the purchases to hotel security. He gave the credit card receipts to hotel security. During the trial of Zanders and Harris, Mr. Nandwani was not asked to make an in court identification of either man.

Sometime between 9:00 and 10:00 a.m., James Routson traveled from the Silver Spring Metro stop to Metro Center. He transferred to the orange line and headed for the Smithsonian station in order to get to his place of employment, the Department of Agriculture. On the way from the Metro Center stop to the Smithsonian stop, he discovered that his wallet was missing. His Core State Visa credit card was in the wallet.

Mr. Routson recalled that as he was descending the escalator at the Metro Center station, a gentleman situated at the bottom of the escalator dropped some papers and a radio, and people on the escalator started bumping into Mr. Routson because his exit from the escalator was blocked by the gentleman. He described the person at the bottom of the escalator as five feet ten and one half inches tall, medium build on the slight side, under forty years of age, under 160 pounds, and a Black male. He gave no clothing description in court. He stated that he picked up a battery which had fallen out of the radio and gave it back to the gentleman who had dropped the radio. Mr. Routson was asked, "do you remember what [the person at the bottom of the escalator] looked like as you sit here today"? He responded, "I couldn't identify him." He gave no testimony regarding who may, or may not, have been behind him.

A Metro Transit police officer, Jonathan Gray, testified at trial that he had taken a report from Mr. Routson. According to him,

---

**2.** Dr. Sokolov's statement of the time frame is close to the times reflected on the hotel registration made with his credit card, and with the time

estimate given by the gift shop owner. Therefore, we see no significant variation in time estimates by the various witnesses.

Mr. Routson had described the man at the bottom of the escalator as a Black male wearing a brown jacket and brown pants, five feet nine inches tall, 160 pounds, light complected, and in his twenties.

Officer Wai Ming Chung of the Metropolitan Police Department, First District, testified that he responded to a radio call at the Holiday Inn, Crown Plaza on October 20, 1990, concerning incidents at the hotel. According to him, the hotel clerk indicated that the men who had been reported to the police had just left the hotel. The clerk pointed out two men who were walking away from the hotel. One man, later identified as Zanders, began to run when he saw the police. The other man, later identified as Harris, continued walking away.

Officer Chung chased and caught Zanders who was a Black male, had on a brown jacket, and had a portable cassette player attached to his person. Zanders was taken to the hotel for a show-up identification. Officer Chung was informed over the police radio that a hotel clerk identified Zanders during the show-up. Officer Chung made an in court identification of Harris as the man who was walking away from the hotel, and Zanders as the man who ran away from the hotel.

Officer Michael Fulton of the Metropolitan Police Department, First District, testified that he was riding in his patrol car when he heard a police radio broadcast regarding the situation at the Holiday Inn, Crown Plaza.[3] He was in the vicinity, and saw several officers chasing a suspect. When a man ran past his police car, Officer Fulton got out and told him to halt. The man, later identified as Harris, kept running and was apprehended by Officer Fulton. Officer Fulton handcuffed Harris and took him back to the hotel for a show-up identification. The officer was told that someone at the hotel had positively identified Harris. He placed Harris under arrest.

Officer Goldie Brown of the Metropolitan Police Department, First District, testified that shortly after 11 a.m. on October 20,

1990, she assisted in the arrest of Zanders and later helped to process him at 300 Indiana Avenue, N.W. Zanders had been searched, and had one hand cuffed to the chair when Officer Brown noticed that he was trying to hide something up his sleeve. Upon investigation, she discovered that Zanders was holding a Visa credit card in the name of James Routson.

Officer Brown testified that during the show-up identification behind the hotel, four to six Black male suspects were presented. At the time he was shown, Zanders wore a brown jacket and a brown shirt. She could not recall the color of Zanders' pants.

Officer Tommie Brooks of the Metropolitan Police Department, First District, conducted the show-up identification at the back of the hotel. He testified at trial that there were five to six suspects who were brought up separately. Each witness viewed each suspect out of the presence of the other witnesses. Officer Brooks stated that the hotel clerk who registered a gentleman as Raymond Sokolov did not make an identification at the show-up. According to him, she was afraid that someone would harm her. However, he testified that Pamela Saunders, the other clerk at the front desk of the hotel, identified Zanders as the man with Harris. She identified Harris as the man who registered for room 1429, but also said that a man named Keith Allen signed for the room. Officer Brooks stated that Mr. Nandwani identified Zanders and Harris as the men who were in his gift shop and further identified Harris as the person who used Dr. Sokolov's credit card and signed the credit card receipt for the items purchased by the men.

Officer Brooks testified that around 10:30 a.m., he went to room 1429 and found a shopping bag containing toiletries, sweatshirts and sweaters. When Zanders was searched after his arrest, a gold bracelet was removed from him, as well as $50 in cash. A search of Harris following his arrest turned up two gold chains and $168.10 in cash.

---

3. Apparently two incidents had taken place at the hotel—the theft with a credit card, and another involving the carrying of guns.

The only defense witness to testify was Richard Stanko, a handwriting expert and a special agent employed by the FBI who was called by Harris. He compared handwriting samples from Zanders and Harris with the signatures on the hotel registration and the Visa credit card receipt slips. He reported that his results were "inconclusive" concerning who signed the credit card receipt slips. Zanders posed no questions to Special Agent Stanko, and presented no witnesses.

## THE TRIAL COURT'S RULINGS ON THE MOTIONS FOR JUDGMENT OF ACQUITTAL

At the end of the government's case, both Zanders and Harris moved for judgment of acquittal. Harris also renewed the motion at the end of all testimony. The trial judge denied Zanders' motion on the grounds that the check-in at the hotel with Dr. Sokolov's credit card revealed possession of recently stolen property; he had the gold bracelet on his person at the time of arrest; he was found with a walkman; he had Mr. Routson's credit card on his person; and he was aiding and abetting Harris in the commission of the crimes involving the robbery of Dr. Sokolov and the use of his credit card.

The trial judge denied Harris' motion because "he was identified as being at the desk" of the hotel; he had two gold chains on his person at the time of arrest; he started running when the police came; he was identified by Mr. Nandwani as the person who signed for the merchandise; and he was aiding and abetting. The trial judge gave no reasons for denying Harris' renewed motion for judgment of acquittal. However, except for the testimony of the FBI special agent concerning handwriting exemplars, Harris put on no defense. Zanders called no witnesses.

**4.** Rule 29(a) provides that:
> The Court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of 1 or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such of-

## SUFFICIENCY OF THE EVIDENCE

■ Both Zanders and Harris moved for judgment of acquittal after the government's case. See Super.Ct.Crim.R. 29(a).[4] Zanders did not renew his motion at the end of all testimony; however, he presented no evidence in his defense. The government argues that the sufficiency of the evidence to convict Zanders is not properly before us on appeal, and that his argument is governed by the manifest error standard of review. See Noaks v. United States, 486 A.2d 1177, 1178–79 (D.C.1985). In United States v. Sherod, 295 U.S.App. D.C. 148, 149–51, 960 F.2d 1075, 1077 (1992), the court ruled that:
> When a defendant offers evidence in his defense after a Rule 29(a) motion, his objection to the denial is waived. He cannot thereafter successfully appeal his conviction based on insufficient evidence without renewal of the motion at the close of all evidence.

Here Zanders offered no evidence in his defense. Only Harris presented a defense witness, Special Agent Stanko, and Zanders posed no questions to this witness. In United States v. Belt, 574 F.2d 1234 (5th Cir. 1978), Belt moved for judgment of acquittal at the close of the government's case. The motion was denied. He put on no evidence, but his attorney cross-examined his co-defendant and also called witnesses to rebut his co-defendant's testimony. On these facts, the court held that there was no waiver of his objection to the denial of his motion for judgment of acquittal:
> In the circumstances of this case we hold that Belt did not forego appellate review of his mid-trial motion for judgment of acquittal by cross-examining his codefendant and calling witnesses to rebut the codefendant's testimony.

574 F.2d at 1236. In United States v. Thomas, 987 F.2d 697 (11th Cir.1993), Thomas made a motion for judgment of acquittal both at the end of the government's case, and at

> fense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.

This rule parallels Fed. Crim. Pro. R. 29(a).

the close of all evidence. He was charged in a two count indictment with conspiracy to possess cocaine with the intent to distribute; and aiding and abetting his codefendant in the use and carrying of a firearm during a drug felony. He did not put on any evidence relating to the second count. The court held that he reserved his right to review of the denial of his motion for judgment of acquittal at the close of the government's evidence:

We conclude that refraining from offering any evidence on the gun count, Thomas reserved his right, under Rule 29, to have this court review that count by considering only the evidence offered by the government during his case-in-chief.

987 F.2d at 704.

 Similarly, we conclude that since Zanders offered no evidence in his defense after his motion for judgment of acquittal following the close of evidence put on by the government, he did not waive his objection to the denial of his motion. Hence, we review the denial of both Zanders' and Harris' motions for judgment of acquittal according to our usual standard. "In reviewing [the denial of a motion for judgment of acquittal based on] the sufficiency of evidence presented at trial we must consider the evidence in the light most favorable to the government to determine if it was sufficient to permit reasonable jurors to find guilt beyond a reasonable doubt." *Id.* (quoting *Dyson v. United States,* 450 A.2d 432, 436 (D.C.1982) (referencing *Byrd v. United States,* 388 A.2d 1225, 1229 (D.C.1978))). Moreover, "[i]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Gayden v. United States,* 584 A.2d 578, 580 (D.C.1990) (quoting *Frendak v. United States,* 408 A.2d 364, 371 (D.C.1979)). *See also Curington v. United States,* 621 A.2d 819, 824 (D.C.1993).

### Robbery and Robbery Of A Senior Citizen

 We turn first to the evidence pertaining to the crimes of robbery and robbery

of a senior citizen. The robbery count of the indictment against Zanders and Harris charged that they took the wallet belonging to James Routson. The robbery of a senior citizen count charged that the two men took a wallet belonging to Raymond Sokolov. D.C.Code § 22–2901 provides that:

Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery, and any person convicted thereof shall suffer imprisonment for not less than two years nor more than 15 years.

To prove robbery in this case, the government must show that Zanders and Harris:

(1) took property of some value from the complainant against the complainant's will;

(2) took the property from the immediate actual possession of the complainant, or from the complainant's person;

(3) used force or violence to take the property, by taking the property by sudden or stealthy seizure or by snatching;

(4) carried the property away; and

(5) took the property without right to it, and with the specific intent to steal it.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.46 (4th ed. 1993).[5] To prove robbery of a senior citizen, the government must meet the elements of robbery and in addition, must show that the victim of the robbery was sixty years of age or older. *See Fields v. United States,* 547 A.2d 138 (D.C.1988).

We conclude that the government failed to prove beyond a reasonable doubt that Zanders and Harris took the wallets from the immediate actual possession of Dr. Sokolov and Mr. Routson, or from their persons, or that a pickpocketing even took place. There was no direct evidence that Zanders and Harris took the wallets, and no expert testimony as to the methods used by pickpockets to remove wallets from the clothing of individuals, or the amount of force necessary to

---

5. The trial judge's instruction to the jury with respect to robbery, repeated the elements set forth in instruction No. 4.46, and elaborated on those elements.

pick a pocket. Hence, there was neither direct nor indirect evidence of a taking of property from Dr. Sokolov or Mr. Routson by anyone, much less by Zanders or Harris. *See United States v. McGill,* 159 U.S.App. D.C. 337, 487 F.2d 1208 (1973). The evidence presented is just as consistent, at least on a reasonable doubt standard, with both victims having lost their wallets and the defendants having found them and having used the credit cards without authority. In short, the government failed to establish the *corpus delicti* of the offense of robbery. In other words, the government failed to show, that the victims were dispossessed of their wallets by some person or persons by stealth or other means.

■ Based upon the evidence presented and viewing this evidence in the light most favorable to the government, we cannot say beyond a reasonable doubt that Zanders and Harris committed robbery, or that a pickpocketing even took place. There is "no evidence from which a reasonable mind might fairly infer guilt [of robbery or robbery of a senior citizen] beyond a reasonable doubt." *Gayden,* 584 A.2d at 580. Without deciding that such evidence, without more, would have been sufficient, we think, at the very least, that with expert testimony pertaining to methods used by pickpockets, the jury may have had a reasonable basis on which to infer guilt.[6] On facts virtually indistinguishable from the encounter here between the victims and the two men in the subway station, we upheld the introduction of expert testimony because it aided the jury in determining the significance of "seemingly innocent acts" on the part of the accused perpetrators. *Hooks v. United States,* 373 A.2d 909, 911 (D.C.1977); but *see also Lampkins v. United States,* 401 A.2d 966, 968–70 (D.C.1979). However, no such testimony was presented here and the jury had no basis for concluding that the "seemingly innocent acts" of the two men in the metro station in fact constituted a robbery. Accordingly, whatever inferences the jury made to infer guilt

were not reasonable. As we said in *Quarles v. United States:* "[W]e are of the opinion that the evidence is so lacking in substance that it cannot support an inference, beyond a reasonable doubt, of guilty participation" in robbery. 308 A.2d 773, 775 (D.C.1973). Furthermore, reasonable jurors could not conclude beyond a reasonable doubt that either Zanders or Harris was guilty of aiding and abetting the robbery of Dr. Sokolov or Mr. Routson, without entering "the forbidden territory of conjecture and speculation." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). The trial judge should have dismissed the robbery and robbery of a senior citizen charges before the case reached the jury because, without the establishment of the *corpus delicti,* there was no evidence upon which a reasonable juror could infer guilt beyond a reasonable doubt. Consequently, we are constrained to reverse the convictions of Zanders and Harris for robbery and robbery of a senior citizen.

### First Degree Theft and Credit Card Fraud

■ We conclude that the evidence was sufficient to convict both Zanders and Harris of the crimes of first degree theft and credit card fraud. D.C.Code § 22–3811(b)(1) and (2) specifies that:

(b) A person commits the offense of theft if that person wrongfully obtains or uses the property of another with intent:

(1) To deprive the other of a right to the property or a benefit of the property; or

(2) To appropriate the property to his or her own use or to the use of a third person.

The indictment charged Zanders and Harris with intentionally and wrongfully obtaining and using gold jewelry and sundries from Mr. Nandwani's gift shop. To prove theft the government had to show that Zanders and Harris:

(1) wrongfully obtained the property of another;

---

6. In so concluding, we are not holding that the government must always present expert testimony where it contends that a pickpocketing has occurred in order to establish its case. We are holding that, on the facts of this case, where the victims were unaware until later that their wallets were missing, at minimum, expert testimony would be necessary to show that the " 'seemingly innocent acts' of the alleged perpetration were, in fact, criminal conduct."

(2) at the time they obtained the property, specifically intended to deprive Mr. Nandwani of a right to the property or a benefit of the property or to take or make use of the property for themselves or for another person, without authority or right; and (3) the property had a value of $250 or more when they obtained it.

CRIMINAL JURY INSTRUCTIONS, *supra*, No. 4.38.[7] Officer Tommie Brooks testified that a gold bracelet was taken from Zanders and two gold chains from Harris at the time of their arrest. Mr. Nandwani testified that the gold bracelet and gold chains came from his gift shop, and identified Zanders and Harris at the show-up identification as the men who purchased the jewelry and toiletries. Dr. Sokolov testified that neither Zanders nor Harris had ever been given permission to use his credit cards. A reasonable jury could infer beyond a reasonable doubt that both men knew they had no authority to use Dr. Sokolov's credit card, and they specifically intended to deprive Mr. Nandwani of the jewelry and sundries from his gift shop. The government, through the testimony of Mr. Nandwani proved that the purchases had a value in excess of $250. Accordingly, the evidence was more than sufficient to convict the two men of first degree theft.

■ District of Columbia Code § 22–3823(b)(1) provides:

(b) A person commits the offense of credit card fraud if, with intent to defraud, that person obtains property of another by:

(1) knowingly using a credit card, or the number or description thereof, which has been issued to another person without the consent of the person to whom it was issued.

To prove credit card fraud the government had to show:

(1) That the defendants: without the consent of the person to whom it had been issued, used a credit card, or the number or description of a credit card, which had been issued to another person; (2) that they did so knowingly, meaning conscious-

ly and on purpose, not mistakenly, accidentally or inadvertently; (3) that they did so with intent to defraud; (4) that they thereby obtained property of another.

CRIMINAL JURY INSTRUCTIONS, *supra*, No. 4.42.[8] Dr. Sokolov did not consent to Zanders' or Harris' use of his credit card. The jury could reasonably infer that neither man used the credit card by accident or through inadvertence, but that they intended to defraud Mr. Nandwani by cheating him out of his gold jewelry, sweatshirts and toiletries. Evidence showed that the gold jewelry, sweatshirts and toiletries had a value in excess of $250. Viewing the evidence in the light most favorable to the government, there was proof from which a reasonable juror could infer that Zanders and Harris were guilty of credit card fraud beyond a reasonable doubt.

### Forgery and Uttering

■ We also conclude that the evidence was sufficient to convict Zanders and Harris of forgery and uttering. D.C.Code § 22–3841(b) provides that: "A person commits the offense of forgery if that person makes, draws, or utters a forged written instrument with intent to defraud or injure another." The trial judge instructed the jury that to prove forgery, the government had to show beyond a reasonable doubt that:

(1) the writing in question, that is, the sale[s] slip, was falsely made by the defendant; (2) the defendant falsely made the writing that is, the sales slip with the specific intent to defraud; and (3) the falsely made writing was apparently capable of effecting a fraud.... That is, the false writing was such that no person of ordinary intelligence could reasonably have been deceived by it.

*See also* CRIMINAL JURY INSTRUCTIONS, *supra*, No. 4.43. The trial judge charged the jury that to prove uttering, the government had to show beyond a reasonable doubt that:

(1) the writing in question, that is the sales slip, was falsely made; (2) the defen-

---

7. The trial court's instructions to the jury regarding theft specified the elements, as set forth in jury instruction No. 4.38.

8. The trial judge's instruction as to the elements of credit card fraud paralleled those in instruction No.4.42.

dant passed or attempted to pass that sales slip to someone having represented it to be true and genuine; (3) the defendant did so knowingly; (4) the defendant acted with specific intent to defraud [another]; (5) the falsely made writing was apparently capable of bringing about a charge.

See also CRIMINAL JURY INSTRUCTIONS, *supra,* No. 4.43. Based upon the testimony of Mr. Nandwani, a jury could reasonably infer beyond a reasonable doubt that Zanders and Harris falsely signed a credit card sales slip for toiletries and sweatshirts, and presented the slip to Mr. Nandwani as true and genuine, with an intent to defraud him. *See Driver v. United States,* 521 A.2d 254, 258–59 (D.C.1987).

▆▆▆▆ Zanders claims that there was a fatal variance between the indictment and the government's proof at trial with respect to the forgery and uttering charges. Specifically, he claims that the forgery and uttering counts of the indictment referred only to a credit card sales slip in the amount of $135.60, but the proof at trial also covered another sales slip in the amount of $1,000 for the gold jewelry purchased. Zanders has confounded the proof of the theft and credit card fraud counts of the indictment with those concerning forgery and uttering. The trial judge limited proof on the forgery and uttering counts to the $135.60 sales slip. There was no "amendment" or "variance" of the indictment. *See Johnson v. United States,* 613 A.2d 1381, 1384 (D.C.1992).[9] In instructing the jury regarding forgery and uttering, the trial court referred to the $135.60 sales slip, and the jury verdict form also mentioned the $135.60 sales slip with respect to these counts. Although the indictment charged forgery and uttering of a legal instrument having the value in excess of $250, the proof mentioned in the indictment

and presented in court lowered the count to a misdemeanor. Hence Zanders and Harris were not prejudiced; indeed the type of prejudice recognized in *Johnson* is not present here. *See Johnson, supra.*[10] In short, there was no fatal variance between the indictment and the government's proof at trial.

## PROSECUTORIAL IMPROPRIETY

Zanders contends that the government engaged in prosecutorial impropriety in: (1) its opening statement to the jury; (2) its questioning of Dr. Sokolov and Mr. Routson; (3) its impeachment of its own witnesses, Mr. Nandwani and Ms. Saunders through the testimony of Officer Brooks; and (4) its closing argument and rebuttal. We see no impropriety. The prosecutor's opening statement was within the bounds of the permissible, and the jurors were told that arguments of counsel do not constitute evidence. Contrary to Zanders' conclusory statements, the questioning of Dr. Sokolov and Mr. Routson generally did not contain improper, leading, or erroneous questions, and when it did and objection was made, the trial judge granted the objection.

▆▆▆▆ Officer Brooks' testimony was offered as permissible out-of-court identification presented through a police officer. "It is well established that 'extra-judicial identification testimony is admissible as independent substantive evidence of identity as long as the out-of-court declarant is available for cross-examination at trial.'" *Jones v. United States,* 516 A.2d 513, 518 (D.C.1986). Here both Mr. Nandwani and Ms. Saunders were available for cross-examination by Zanders. "Moreover, we have made it clear that out-of-court identification testimony is admissible even when the witness is unable to make an in-court identification." *Id.* at 519 (referenc-

9. "An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." 613 A.2d at 1384.

10. *Johnson* concluded that an indictment "must inform the accused of the charges against him so

that he may adequately prepare his defense, it must describe the crime with sufficient specificity to protect the accused against future prosecution for the same offense, and it 'protect[s] against oppressive actions of the prosecutor or a court, which may alter the charge to fit the proof.'" *Johnson,* 613 A.2d at 1384 (referencing and quoting *Wright v. United States,* 564 A.2d 734, 737 (D.C.1989)).

ing *Rice v. United States,* 437 A.2d 582, 583 (D.C.1981) (per curiam)).

The prosecutor's closing argument and rebuttal reflected the testimony introduced at trial and the reasonable inferences to be drawn from that evidence. No objection to the argument was made at trial. Therefore, we review for plain error; we see none. *See United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The argument and rebuttal were not "so clearly prejudicial to [Zanders'] substantial rights as to jeopardize the fairness and integrity of the trial." *Byers v. United States,* 649 A.2d 279, 288 (D.C.1994). Hence, we reject Zanders' prosecutorial impropriety argument.

### THE SHOW–UP IDENTIFICATION

Harris argues that the show-up identification was impermissibly suggestive and the identification unreliable. When there is a challenge to identification procedures, we ask two questions:

> (1) Was the identification procedure "unnecessarily suggestive and conducive to irreparable misidentification"? (2) If so, given the "totality of the circumstances," was the resulting identification reliable nonetheless?

*Patterson v. United States,* 384 A.2d 663, 665 (D.C.1978) (citations omitted); *see also Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967). During the show-up identification five to six suspects were presented. They were brought up individually, and each witness viewed the suspects out of the presence of the other witnesses. There was nothing unduly suggestive about this procedure. Nor was it conducive to irreparable misidentification.

Harris asserts that the identifications of Ms. Saunders at the hotel and Mr. Nandwani at the gift shop were unreliable. Ms. Saunders focused on Mr. Harris while he was in the hotel, and identified him in court. Mr. Nandwani gave a description of the two men who first entered his gift shop, and there is nothing in the transcript to suggest that the

description was erroneous. Both Ms. Saunders and Mr. Nandwani had the opportunity to view Harris. Both paid attention to detail and gave descriptions which are not challenged on the record. The record reflects a sound level of certainty concerning their descriptions. The time of the registration at the hotel was 8:24 a.m. The men entered the gift shop at approximately 8:30 a.m. The show-up identification occurred around 11:00 a.m. Hence, under *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the identifications would be deemed reliable. *See also Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

We agree with the trial judge's findings and determination in the § 23–110 hearing, *see infra,* that even assuming the show-ups were suggestive, the identifications of Harris by Ms. Saunders and Mr. Nandwani were reliable. Hence, we reject Harris' argument that the show-up identification was impermissibly suggestive and unreliable.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Harris filed a § 23–110 (1989 Repl.) motion contending that he was denied effective assistance of counsel because his trial counsel (1) denied him the opportunity to testify in his own behalf, (2) failed to investigate the handwriting on the sales slip; (3) failed to make an opening statement; (4) failed to file pre-trial motions, including a motion to suppress the gold chains and the show-up identification, and a motion to sever his trial from that of Zanders; and (5) failed to meet with him to discuss his case. On November 14, 1994, the trial court held a hearing on his motion. Harris testified, as did his trial counsel, Paul Keller. The trial judge questioned Harris concerning his complaints against Mr. Keller.

First, Harris said he wanted to take the stand to testify in his own behalf, but did not want to say anything about Zanders whom he did not know, even though he bought the gold jewelry from Zanders in the subway.[11]

---

11. The trial judge pointed out that Harris' § 23–110 motion described Zanders as a friend. Har-

ris said he used those words as "a figure of speech." However, on cross-examination he ad-

In response to the trial judge's question as to whether his trial counsel had informed him that the government could bring out his three past drug convictions if he testified, Harris responded in the affirmative. He further stated that he discussed testifying with his trial counsel after the government had concluded its case but decided not to testify. Later he said the discussion concerning whether he would testify did not take place until just prior to the closing arguments. On cross-examination, however, he admitted that not only did he tell his attorney that he did not wish to testify, but he had also been questioned by the trial judge and communicated to him his decision not to testify. Mr. Keller, Harris' trial counsel, testified that he was concerned about Harris testifying because he had no "clear idea" as to what he was doing on the day of his arrest. Nonetheless he left the decision to testify, or not to testify, to Harris, and had asked the trial judge to inquire as to Harris' understanding of his right to testify.

Second, Harris said he wanted Mr. Keller to investigate the handwriting on the credit card receipts to prove that it was not his. On cross-examination, Harris acknowledged that Mr. Keller had brought a handwriting expert to speak with him. Mr. Keller confirmed that he had used a handwriting expert, and indeed, Special Agent Stanko was called to testify as to his conclusions regarding the handwriting on the credit card receipts. Harris could not identify any other witnesses he thought Mr. Keller should have called in his behalf.

Third, Harris expressed the view that his counsel could have been "a little bit more aggressive in [the] opening statement." When it was called to his attention that Mr. Keller made no opening statement, Harris said he wanted him to make one. Mr. Keller explained that he gave no opening statement because he was uncertain about what Harris would say if he took the stand since he had

given him different versions of what had happened on the day of his arrest.[12] Since Harris did not have to make the decision about testifying until after the government's case, Mr. Keller decided not to give an opening statement at the beginning of the case. When it became clear that Harris would not testify, Mr. Keller made no opening statement before the defense case because Harris had no witnesses to call, except Special Agent Stanko, and his testimony was not conclusive as to the handwriting on the credit card receipts.

Fourth, Harris argued that Mr. Keller "could have suppressed the evidence of the showup," and the gold chains. Harris said he and Zanders were handcuffed during the show-up, but he did not know whether some other men whom police had detained in another police car, and who apparently were part of the show-up identification, were also handcuffed. He thought six persons may have been presented at the show-up. He believed that if the gold chains had been suppressed, he would not have been connected to the use of Mr. Sokolov's credit card. Furthermore, in his view, he could have testified had his trial been severed from that of Zanders.

Mr. Keller testified that he filed no severance motion because he didn't think the trial judge "would grant that type of motion, given the economy of judicial time, and [he] didn't see that much merit in filing a severance."[13] Mr. Keller did not file a motion to suppress the gold chains because he "didn't see any reason to expect that there would be any success in filing" such a motion. He filed no motion regarding the show-up identification because:

> [Harris] had been pointed out by an employee who had very recently seen him. The police gave chase.... There was never any suggestion of a lapse of time such that the police lost sight of him.... [The witnesses] weren't collectively identi-

---

mitted telling his trial counsel's investigator that he knew Zanders.

12. When he was questioned by the trial judge at his § 23–110 hearing, Harris also gave different accounts regarding his actions on the day of his arrest.

13. Zanders filed a motion for a severance. However, it was denied on the ground that the cases were properly joined initially and Zanders could not show undue prejudice.

fying him and he was not individually presented to them in such a fashion that it suggested to me that it was suggestivity.

Fifth, Harris said that Mr. Keller met with him only once prior to trial, and that meeting lasted only fifteen minutes to a half hour. Later he admitted talking with Mr. Keller on another occasion by telephone, and meeting with him several times while the trial was in progress. Mr. Keller testified that he met with Harris six to ten times prior to trial, excluding telephone conversations. He met with Harris once at Lorton, and on the other occasions at the courthouse.

■■■■ The trial court denied Harris' § 23–110 motion because he failed to meet the burden of proof imposed on him by *Strickland.* Under that case he must show (1) deficient performance by his trial counsel, and (2) prejudice traceable to his trial counsel's deficiencies. The burden is a heavy one because of a strong presumption that defense counsel has rendered reasonable professional assistance. *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065. *See also Curry v. United States,* 498 A.2d 534, 540 (D.C.1985). With respect to deficient performance, Harris must show that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. Moreover, to prove prejudice he "must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The trial judge concluded that Harris failed to show either deficient performance by Mr. Keller, or prejudice. We see no reason to disturb this conclusion. The trial judge found Mr. Keller's testimony to be credible. Moreover, she determined that Harris "chose not to testify," that he discussed the matter with his counsel, and that his testimony on this issue at his § 23–110 hearing "was wholly incredible." Harris gave different versions of what he did on the day of his arrest to his counsel, just as he did

to the trial judge at the hearing. The trial judge concluded that:

> there are a number of issues that could have been mined by the Government if Mr. Harris had testified.... [H]is demeanor was not credible, his story wasn't credible, and the prior convictions could have had an effect as well with respect to how the jury viewed his credibility.

We agree. The record also shows that Harris' testimony was not credible with respect to the handwriting investigation, that in fact Mr. Keller did obtain an expert and called him as a defense witness for Harris.

■■■■ The trial judge viewed the failure of Mr. Keller to make an opening statement as "within the range of tactical decisions." He did not want to promise testimony that might never materialize and might leave the jury to "[wonder], well, where is that evidence they promised and didn't deliver....'"? Trial tactical decisions generally do not result in a finding of ineffective assistance of counsel. As we said in *Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985): "It is not our function, nor should it be, to second guess these types of judgment." This is true because "[m]any alternative tactics are available to defense attorneys and their actions are often the products of strategic choices made on the basis of their subjective assessment of the circumstances existing at trial." *Id.*

■■■■ With respect to the pre-trial motions, the trial court concluded that Harris had shown neither deficient performance by his counsel, nor prejudice. The trial judge noted that the filing of these motions is often a tactical decision. Moreover, there must be some basis for filing a motion; there is no professional obligation to file a motion that may have no merit. *See Wright v. United States,* 608 A.2d 763, 766 (D.C.1992). After reviewing the government's evidence, the trial judge stated that:

> there was no basis to file a motion to suppress pretrial; and even if there had been, there is no prejudice shown by the failure to file because during trial it could have been raised, but it was quite clear from the trial evidence that there was at

least a reasonable articulable suspicion to stop Mr. Harris because of the hotel clerk indicating the gentlemen had just left; that once the police walked right outside the door after they had just left ... their attention was drawn to them as the defendants then viewed the police officers and changed the course of their direction and one ran. Mr. Harris walked.... And that there was certainly a [reasonable] articulable suspicion to investigate further; and that in the end, probable cause would have been found to arrest ... that the probable cause would have been found since the search was incident to a lawful arrest, that the necklaces and money could not be suppressed.

With regard to the show-up identification, the trial judge found that the witnesses viewed the suspects "separately, so that neither would infect the other with their views." There was no "suggestivity" because of the manner in which the show-up was conducted. Moreover the identification was reliable because it was close in time to the events that took place. "Even if there were fault in [the failure] to file a motion to suppress," said the trial judge, "there is no prejudice shown to the defendant because of the facts that came out during trial indicating that it was not a [c]onstitutionally impermissible identification procedure." We have also concluded that the show-up identification of Harris was not unnecessarily suggestive, and the identification of Harris was reliable. Hence, we cannot say that Mr. Keller displayed deficient performance in failing to file a motion to suppress.

■ Nor can we say that Mr. Keller's failure to file a motion to sever fell into the category of deficient performance. Under Super. Ct. Crim. R. 8(b) "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Here Harris and Zanders were charged with the same offenses growing out of the same transactions. Joinder was proper and a motion for a severance would have been futile on this record which reveals no inculpatory statement by Zanders against Harris, or irreconcilable defenses. *See Catlett v. United States,* 545 A.2d 1202 (D.C.1988), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989) and *Evans v. United States,* 392 A.2d 1015 (D.C.1978). Accordingly, we conclude that Harris' ineffective assistance of counsel argument lacks merit.

For the foregoing reasons we reverse Zanders' and Harris' convictions for robbery and robbery of a senior citizen, and affirm their convictions for first degree theft, credit card fraud, and forgery and uttering. As we customarily do in these circumstances, to permit the trial judge to impose sentence in accord with an overall sentencing scheme, we vacate the sentences for those offenses and remand for sentencing. *See Bean v. United States,* 576 A.2d 187 (D.C.1990) and *Thorne v. United States,* 471 A.2d 247, 249 (D.C.1983).

*So ordered.*