Colie L. LONG, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CO–1613.

District of Columbia Court of Appeals.

Argued April 6, 2011.

Decided Feb. 2, 2012.

Sydney J. Hoffman, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, and Roy W. McLeese III, Suzanne C. Nyland and James Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON, Associate Judge, and SCHWELB and REID, Senior Judges.*

REID, Senior Judge:

We previously resolved part of appellant Colie L. Long's consolidated appeal following his conviction on charges of conspiracy to commit murder, first-degree premeditated murder while armed, assault with a dangerous weapon, and possession of a firearm during a crime of violence. *See Long v. United States*, 910 A.2d 298 (D.C. 2006) (*Long I* ). Mr. Long was convicted of the shooting death of a fourteen-year-old boy, Ronald Williamson, two weeks after Mr. Williamson threatened Mr. Long at gunpoint. *Id.* at 301. The government's evidence established that William Tilghman and Mr. Long were together at the time of the murder, that Mr. Long instructed Mr. Tilghman to kill Mr. Williamson, but that when Mr. Tilghman hesitated, Mr. Long grabbed the gun and shot Mr. Williamson multiple times.[1] *Id.* at 301–02. As we stated in *Long I*, "the theory of [Mr. Long's] defense was that [Mr.] Tilghman killed Mr. Williamson by himself, and that he was lying about [Mr.] Long's participation in the murder in order to receive a lighter sentence." *Id.* at 302.

Although we rejected two of Mr. Long's direct appeal claims, we vacated the trial court's order denying his D.C.Code § 23–

---

* Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on December 12, 2011.

1. Mr. Tilghman testified as a government witness after entering into a plea agreement under which he pled guilty to voluntary manslaughter while armed. *Long I*, 910 A.2d at 302.

110 (2001) motion for a new trial based on ineffective assistance of counsel, because the trial court denied that motion without a hearing. *Id.* at 301. We said that a hearing was necessary to assess the credibility of witnesses, because "credibility determinations cannot be based on affidavits or countered by conclusory statements but may be resolved only by recourse to a full evidentiary hearing." *Id.* at 310 (quoting *Newman v. United States,* 705 A.2d 246, 261, 262 (D.C.1997) (internal quotation marks omitted)). Consequently, we remanded the case "for further proceedings on the [D.C.Code § 23–110] motion in accordance with our opinion." *Id.* at 310–11. On remand, the trial court held an evidentiary hearing on the ineffective assistance of counsel motion and subsequently denied the motion. Mr. Long challenges the denial of his motion. We affirm the trial court's judgment of conviction, and its judgment denying Mr. Long's D.C.Code § 23–110 motion.

In addition to the ineffective assistance of counsel issue, before us is the trial court's denial of Mr. Long's renewed motion for correction of sentence pursuant to Super. Ct. Civ. R. 35. He asserts that his sentence is illegal because the trial court made findings on matters that should have been decided by the jury. We disagree and affirm the trial court's denial of Mr. Long's Rule 35 renewed motion for correction of sentence.

## SUMMARY OF THE EVIDENTIARY HEARING ON REMAND

On remand, the trial judge conducted an evidentiary hearing on Mr. Long's D.C.Code § 23–110 motion. The hearing took place on, April 23 and 24, 2008, and August 5, 2008.

### *Mr. Long's Witnesses*

Mr. Long presented seven witnesses.[2] Their testimony variously focused on (1) an alleged statement by Mr. Tilghman showing that he and not Mr. Long killed Mr. Williamson; (2) the injury to Mr. Long's hand which allegedly made it impossible for him to shoot Mr. Williamson; (3) Mr. Long's dissatisfaction with his attorney, Mitchell Baer; and (4) an alleged conspiracy to harm Mr. Tilghman. Following is a summary of the testimony of Mr. Long's witnesses.

Halim Flowers, who grew up with Mr. Long, stated that he had been in prison for eleven years, and that he had met Mr. Tilghman[3] in 1997, when they were incarcerated in the juvenile block at the D.C. Jail. Mr. Tilghman told him (Mr. Flowers) "that he had committed a murder, or that he was going to beat the murder ... by blaming it on another individual by the name of Meatball [Mr. Long]." Others who heard Mr. Tilghman's confession were Michael Plummer, Momolu Stewart, Dominique Littlejohn, and Michael White. Sometime between February 1998 and May 1998, Mr. Flowers and Mr. Stewart met with a defense lawyer or investigator

**2.** One of the potential witnesses whom we mentioned specifically in *Long I* was Timothy Padgett. On April 24, 2008, counsel for Mr. Long, Thomas Heslep, announced that he was "not going to call [Mr. Padgett] at this point" because "he's unsure of himself, and I can't put him on." In *Long I,* we noted that Mr. Padgett had signed an affidavit on September 19, 2002, indicating that on the day following Mr. Williamson's murder, Mr. Tilghman attempted to sell him (Mr. Padgett) a black revolver; and that he was in jail with Mr.

Tilghman in October 1996, when Mr. Tilghman "used to tell [him] how he caught Man–Man [Mr. Williamson] slipping and killed him." 910 A.2d at 306, 307 n. 7 (internal quotation marks omitted).

**3.** Mr. Tilghman's name is spelled "Tillman" in the transcript regarding the § 23–110 hearing, but we use the same spelling that appeared in *Long I.*

and recounted what Mr. Tilghman had said. Mr. Flowers was impeached with his felony convictions (including first-degree murder and first-degree burglary while armed).

Momolu Stewart also was incarcerated with Mr. Tilghman in the juvenile block of the D.C. Jail, in 1998. He was a co-defendant in a case with Mr. Flowers before the charges against him (Mr. Stewart) were dismissed. He acknowledged that Mr. Flowers, Mr. Plummer, Mr. Long, Mr. Hunter, and Mr. Bellinger also were at the D.C. Jail in 1998. He became "real close" with Mr. Tilghman and talked with him "[p]retty much like every other day" about how Mr. Tilghman "said he was going to put the case on Colie Long because somebody . . . said they was going to do something to his mother." Mr. Tilghman "[b]asically said he committed the murder on [Mr. Williamson]." Mr. Stewart admitted that he had been convicted of first-degree murder in 1998, and he also acknowledged convictions on weapons offenses on more than one occasion. He stated that Mr. Tilghman had spoken to him "[a]bout ten times" concerning Mr. Long's case, but that he could not remember the details.

Patrick Andrews described himself as "an old friend" of Mr. Long. Their families lived in the same neighborhood. In early 1996, Mr. Andrews saw Mr. Long with a "hard cast" on his right hand.[4] He spoke with Mr. Long again sometime in 1998; Mr. Long said "he needed [Mr. Andrews] to be a witness for him." Mr. Andrews later talked with Mr. Long's counsel about Mr. Long's hand. Mr. Andrews did not testify on behalf of Mr. Long. He acknowledged that he was incarcerated in March 1998. Mr. Andrews admitted that he had been convicted in two separate cases for

first-degree murder while armed and related weapons charges.

Kevin Bellinger and Mr. Long are cousins. He was with Mr. Long at a club when a fight broke out and Mr. Long injured his hand. Later, Mr. Bellinger saw Mr. Long with a hard cast on his hand on more than one occasion within about a two-week period. Mr. Bellinger admitted that he was found guilty, in 1999 and 2002, of weapons offenses, attempted possession with intent to distribute cocaine, and assault with intent to kill while armed, with accompanying weapons violations.

Lawrence Hunter was incarcerated with Mr. Long and Mr. Tilghman at the D.C. Jail, in 1996. While he was on the juvenile block, he heard Mr. Tilghman brag about killing [Mr. Williamson]. Mr. Hunter was not called as a witness at Mr. Long's trial, and he did not recall being in court on March 16, 1998, and invoking the Fifth Amendment, or being told that "the government believed they had evidence that he [Mr. Hunter] [was] part of a conspiracy to harm [Mr.] Tilghman." Nor did he remember refusing to speak with Mr. Long's counsel on February 27, 1998, because Mr. Long "advised [him] not to speak to his [Mr. Long's] attorney." Nor did he remember having written letters containing threats against Mr. Tilghman. Mr. Hunter admitted that he was convicted of first-degree murder in a 1996 case. On redirect examination, Mr. Hunter recalled being angry with Mr. Tilghman about his attempt to put Mr. Williamson's murder on Mr. Long, because it was wrong. However, he never told anyone about Mr. Tilghman's plan. He stated that he was never charged with threats against Mr. Tilghman or with obstructing justice in Mr. Long's case.

---

4. Mr. Long's defense theory was that he could not have shot Mr. Williamson because of an injury to his right hand, as evidenced by the hard cast that Mr. Andrews saw.

Michael Plummer was incarcerated with Mr. Tilghman in the juvenile block of the D.C. Jail in 1997. He heard Mr. Tilghman say that he committed a murder but that he would "put it on Meatball" (Mr. Long). When Mr. Plummer turned 18, he was moved to the adult block where he met Mr. Long. Mr. Long had heard that Mr. Plummer had been on the juvenile block with Mr. Tilghman. Mr. Plummer gave testimony at Mr. Long's first trial.[5] Government counsel impeached Mr. Plummer with his convictions on charges of first-degree murder while armed and related weapons offenses. Mr. Plummer acknowledged that his own counsel advised him not to testify at Mr. Long's second trial; Mr. Plummer's own retrial occurred at the same time as Mr. Long's retrial.[6] On redirect examination at the § 23–110 hearing, Mr. Long's counsel tried to pose questions to determine whether Mr. Plummer did not testify at Mr. Long's second trial because of fear of an obstruction of justice charge, but the trial court sustained objections to the questions. However, the court allowed Mr. Plummer to respond to the question: "Did you not testify at the second trial because you would get into trouble?" Mr. Plummer responded, "Yes."

Government counsel inquired about the prosecutor's cross-examination of Mr. Plummer during his testimony at Mr. Long's first trial. The cross-examination included questions concerning whether (1) Mr. Plummer "had authored a report in jail that people were pressing on [him]," that is, "people were violating [his] body"; (2) "he would do anything to keep them off of [him]"; (3) a man "named Gangster came up to [him and another man named

Littlejohn], told [him] to go after [Mr.] Tilghman, [and] that's exactly what [Mr. Plummer] started to do"; (4) he had stolen the shoes he was wearing in court from Mr. Tilghman, and (5) when Mr. Tilghman "asked for his shoes back, ... [he] t[o]l[d] [Mr.] Tilghman, 'you better be glad that I just took your shoes, because we were supposed to kill you.'" Government counsel used the March 13, 1998, transcript from Mr. Long's first trial to establish that the questions had been asked and that Mr. Plummer had denied the accusations. Government counsel then asked Mr. Plummer at the § 23–110 hearing, whether at Mr. Long's first trial, "the prosecutor was accusing [him] of being involved in the conspiracy to kill Mr. Tilghman." The trial court sustained the defense objection to that question. After several more questions, government counsel inquired whether "the substance of the [prosecutor's] question ... [was] that [Mr. Plummer was] supposed to kill [Mr.] Tilghman?" Mr. Plummer answered, "Yes." Mr. Plummer acknowledged that in a 1997 case, he was convicted of first-degree murder while armed and weapons offenses.

Mr. Long began his testimony at the § 23–110 hearing by explaining the reasons for his dissatisfaction with his trial counsel, Mr. Baer; Mr. Baer represented him at his first and second trial. Mr. Long's dissatisfaction included Mr. Baer's failure to personally investigate Mr. Long's case, his advice that Mr. Long not testify at the suppression hearing or at trial, Mr. Baer's lack of experience in trying murder cases, and Mr. Baer's alleged failure to call witnesses, including Tiffany Rauch.[7] With respect to the injury to his

---

**5.** A mistrial was declared as to all of the charges against Mr. Long, except carrying a pistol without a license; Mr. Long was found guilty of that offense.

**6.** Mr. Plummer's retrial began on June 25, 1998 and Mr. Long's retrial took place from June 22 through July 1, 1998.

**7.** In *Long I*, we indicated that Mr. Long wanted Ms. Rauch called as an alibi witness. *Id.*

right hand, Mr. Long indicated that about three weeks before the shooting of Mr. Williamson, he broke the knuckle of his hand during a night club fight and it was still swollen at the time of the shooting.

Mr. Heslep asked Mr. Long about Mr. Plummer's failure to testify at Mr. Long's second trial. He responded:

> He [Mr. Baer] said he did not put Mr. Plummer on the stand because of allegations that Mr. Plummer had stole [Mr.] Til[gh]man's tennis shoes and certain things and he said my association with [Mr.] Plummer makes me look bad because they're trying to say that I was sending guys to threaten [Mr.] Til[gh]man and trying to say obstruction of justice. So he said me being associated with the guys, he wouldn't call them for a witness.

Mr. Long denied directing anyone to intimidate Mr. Plummer. When Mr. Heslep inquired whether Mr. Long had talked with Mr. Baer about the fact that he was not convicted at his first trial even though Mr. Plummer answered questions about the sneakers and intimidation, Mr. Long said he had and that Mr. Baer "was adamant ... that my being associated with this guy with allegations of me trying to witness tampering and threatening him, that he didn't want to put him on the stand." Furthermore, Mr. Long expressed dissatisfaction with Mr. Baer because he did not follow-up on information Mr. Long gave him about (1) government witness Angela Wheeler's visits to him at the jail and her assertion that she had lied during her testimony, and (2) the clothes found in his apartment belonging to Mr. Tilghman and not to Mr. Long, as well as the failure to examine the shell casings

found at the scene to prove that Mr. Long's fingerprints were not present.

During cross-examination by government counsel, Mr. Long confirmed that Ms. Rauch was related to him and that he "hung out with her or she was in [his] circle of friends." In addition, counsel established that Mr. Long's family had hired a private investigator during representation by his first counsel, not Mr. Baer. Government counsel turned to the firing of Leroy Nesbitt, another attorney who had represented Mr. Long, and inquired why Mr. Nesbitt was fired. Mr. Long replied that Mr. Nesbitt wanted him to testify that Mr. Tilghman had killed Mr. Williamson. When asked how he knew that Mr. Tilghman had killed Mr. Williamson, Mr. Long maintained that he (Long) was in the apartment building when he heard shots and that Mr. Tilghman had run to the apartment and said he had killed Mr. Williamson. On the subject of Mr. Long testifying at his own trial, government counsel said: "And the reason you didn't is because of the advice of your counsel that you would be impeached with the alleged confession you gave to the police when you were arrested; is that correct?" Mr. Long answered: "His exact words was they were going to find me guilty because the detectives will come in and say you confessed to it ... and it will be your word against their word and the jury is going to go with the police." [8]

### The Government's Witness

The government called one witness during the § 23–110 hearing, Mr. Baer. In response to government counsel's question as to whether he attempted to present Mr. Plummer as a witness in Mr. Long's retrial

---

at 309. According to Mr. Long, the private investigator his family hired had contacted Ms. Rauch and scheduled a meeting, but Ms. Rauch did not show up for the meeting. Mr.

Heslep apparently was unable to find Ms. Rauch at the time of the § 23–110 hearing.

**8.** Ultimately, the confession was suppressed.

proceeding, Mr. Baer declared, "I believe that because of the nature of his testimony in the first trial and because of the Fifth Amendment issue, I don't believe I presented Mr. Plummer in the second trial." By "nature of his testimony" Mr. Baer explained that he was referring to the cross-examination questions the prosecutor had asked Mr. Plummer, at Mr. Long's first trial, relating to Mr. Plummer's alleged theft of Mr. Tilghman's basketball shoes and his alleged threats against Mr. Tilghman—"something to the effect that Mr. Til[gh]man was lucky that all they did was take his shoes because they were threatening to stab him."

In February 1998, Mr. Baer spoke with men who were incarcerated with Mr. Long about Mr. Tilghman; three men refused to speak with him. Of those to whom he spoke, Mr. Baer "was skeptical of what they were telling [him] for a number of reasons," including their serious criminal charges and "inconsistencies in what they told [Mr. Baer]." He became concerned "about whether they were telling the truth." He moved to withdraw from the case because of "ethical concerns about presenting testimony that he knew to be false." The motions judge advised him to consult with Bar Counsel. Bar Counsel advised him to try to persuade Mr. Long not to present false testimony, but if he was not successful, he should present the testimony. Mr. Baer withdrew his motion to withdraw.

Mr. Baer informed Mr. Long that he did not believe Mr. Stewart was credible and Mr. Long agreed not to present him as a witness. However, Mr. Long disagreed with Mr. Baer's decision not to call Ms. Wheeler, so Mr. Baer called her as a witness. Mr. Baer spoke with the doctor at the D.C. Jail about Mr. Long's right hand injury and that doctor said that the hand injury would not have prevented Mr. Long from firing the gun, and therefore, Mr. Baer did not call the doctor as a witness. Mr. Baer was able to make contact with Ms. Rauch. He determined that "she would not be helpful at all to Mr. Long" because she claimed that at the time of the Williamson shooting, Mr. Long was asleep in her apartment, but Mr. Long had informed Mr. Baer that he was asleep in Florence Green's apartment when the shooting occurred. In addition, Mr. Baer's July 18, 1997, notes show that according to Mr. Nesbitt, Mr. Tilghman "told [Ms. Rauch] . . . to hide the guns" and that "both . . . Mr. Long, and Mr. Til[gh]man had guns."

On cross-examination, Mr. Heslep wanted to know why Mr. Baer called Mr. Plummer during the first trial, but not Mr. Flowers, Mr. Stewart and Mr. Hunter. Mr. Baer replied that he "had no reason not to put on Mr. Plummer" and that he "became skeptical of the others because . . . they refused to speak with [him] at first" and because "they all had very serious charges" which "was going to detract from their credibility." He also thought their location on the same block with Mr. Long at the D.C. Jail, "would have been a pretty big coincidence." However, he did not recall examining the records at the D.C. Jail to determine whether Mr. Long and the others were in the same block at the jail. Although he had some of the men to whom he had spoken brought to the courthouse for the second trial "because Mr. Long wanted [him] to call them," he did not put them on the stand because "it was a combination of them asserting the Fifth Amendment, . . . [and] there were disadvantages to calling them that [he] had discussed with Mr. Long and [Mr. Long] agreed that it would be better not to call at least some of them."

As an example of a disadvantage, Mr. Baer pointed to the government's cross-

examination questions, posed during Mr. Long's first trial, about "some kind of a conspiracy to get Mr. Til[gh]man" and the government's revelation "that for the second trial ... they were going to pursue that line of cross-examination with the other witnesses, other than Mr. Plummer." Mr. Baer agreed that the conspiracy line of Mr. Plummer's cross-examination at the first trial "hadn't been a complete disaster." When asked why, then, he had not read Mr. Plummer's testimony at the first trial into the record of the second trial after Mr. Plummer asserted the Fifth Amendment, Mr. Baer said: "I can't recall if I considered it, but all of his testimony would have come in.... I can't recall if it occurred to me or not. It may not have occurred to me." Mr. Baer "probably did not" discuss the introduction of the transcript of Mr. Plummer's testimony with Mr. Long.

On redirect examination, Mr. Baer was again asked about Mr. Plummer's cross-examination during the first trial. He declared that "it was quite a surprise to [him] that [Mr.] Plummer was alleged to have been wearing [Mr.] Til[gh]man's shoes and it was also a surprise to [him] that he was alleged to have been biased against [Mr.] Til[gh]man in this plot to potentially stab him, so that made his testimony—that hurt his credibility." As to the reading of Mr. Plummer's cross-examination into the record of the second trial, Mr. Baer asserted: "I would probably be pretty reluctant—thinking back on it now, I would probably be pretty reluctant to do that, based on the cross-examination."

## THE TRIAL COURT'S DECISION ON THE SECTION 23–110 MOTION

The trial court rendered its decision on the D.C.Code § 23–110 motion on December 10, 2008, in a twenty-five page order. Judge Christian discredited the testimony of Mr. Long and the other defense witnesses, but credited the testimony of Mr. Baer. Based upon the testimony given during the hearing, and consistent with her credibility determinations, Judge Christian made findings of fact relating, in part, to the incarceration of potential defense witnesses with Mr. Tilghman in the juvenile block of the D.C. Jail, the transfer of some of those witnesses to the adult cellblock at the jail where they met Mr. Long, Mr. Baer's surprise at the cross-examination responses of Mr. Plummer during Mr. Long's first trial, Mr. Baer's concern about the veracity, credibility and criminal records of those whom Mr. Long wanted as his witnesses, Mr. Long's "active role in directing his defense," Mr. Baer's serious concerns about Mr. Plummer's truthfulness and his willingness to change his testimony, Mr. Baer's investigation of Mr. Long's claim that he could not have shot Williamson because of his broken right hand, Mr. Long's ability to "ball[ ] his fingers together to legibly sign his name on the PD–47 card only hours after Mr. Williamson was shot and killed," Mr. Baer's conclusions about Ms. Rauch's proposed testimony, Mr. Baer's investigation of the lighting at the scene at the time of the shooting, and Mr. Baer's cross-examination of Ms. Wheeler which resulted in her statement that "she was not certain who actually shot Mr. Williamson."

Judge Christian made conclusions of law rejecting Mr. Long's claims that Mr. Baer was ineffective because he did not present (1) testimony regarding Mr. Long's inability to shoot a gun at the time Mr. Williamson was shot; (2) the testimony of Mr. Flowers, Mr. Stewart, Mr. Hunter, and Mr. Plummer at the second trial; (3) Ms. Rauch's testimony; and (4) nighttime photographs of the crime scene. Judge Christian summarized her conclusions as follows:

Based on the evidence presented during the evidentiary hearing in this matter, the [c]ourt finds that Mr. Baer was not ineffective in representing [Mr. Long] in his first and second jury trials. In foregoing the presentation of evidence related to [Mr. Long's] hand injury, Mr. Baer made a strategic decision premised on a sound investigation of facts available at the time. In addition, the lack of testimonial evidence from [Mr.] Flowers, [Mr.] Stewart and [Mr.] Hunter was based on a combination of said individuals invoking their Fifth Amendment privilege against self-incrimination and a lack of general credibility. Likewise, although [Mr.] Plummer testified in the Defendant's first trial, Mr. Baer's decision to avoid using his testimony in [Mr. Long's] second trial was a tactical decision designed to avoid introducing potentially incriminating evidence from a less than credible witness. Moreover, Mr. Baer's decision not to present [Ms.] Rauch as a potential alibi witness represented another strategic decision to avoid the introduction of potentially incriminating evidence and complications from a less than willing witness. Finally, although Mr. Baer could have introduced nighttime photographs of the crime scene during [Mr. Long's] trials, his failure to do so did not prejudice [Mr. Long] in any way. Thus, [Mr. Long] has presented no viable argument for why this [c]ourt should find Mr. Baer ineffective during his representation of [Mr. Long].

## ANALYSIS

### Ineffective Assistance of Counsel

Mr. Long contends, in part, that his trial counsel's performance was constitutionally deficient and, "as a direct result of these deficiencies, [he] suffered prejudice." Specifically, he argues that his counsel:

(1) failed to litigate or challenge [Mr.] Plummer's purported assertion of privilege at the second trial or, in the alternative, to introduce [Mr.] Plummer's prior sworn testimony into evidence at the second trial; (2) neglected to fully investigate [Mr.] Long's serious hand injury that would have impacted [Mr.] Long's ability to load, shoot, and otherwise handle the weapon purportedly used to murder [Mr.] Williamson; and (3) failed to obtain nighttime photographs of the crime scene that would have corroborated a key witness's testimony that the area was too dark to discern who the shooter was.

The government responds that: "The record amply supports the trial court's finding that, even if [Mr.] Plummer had been available to testify in person or via transcript in [Mr. Long's] second trial, defense counsel made a reasonable tactical decision not to present that testimony." Moreover, the government emphasizes the "evident impact of the conspiracy charge," filed against Mr. Long prior to his second trial, and in light of that impact, the government contends that Mr. Long "cannot demonstrate a reasonable probability that there might have been a different outcome if [Mr.] Plummer's testimony had been part of the second trial." Under the conspiracy charge, Mr. Long could be convicted without having fired the gun. With respect to the injury to Mr. Long's hand and the absence of nighttime photographs of the crime scene, the government asserts, in part, that even assuming Mr. Long's counsel had introduced evidence showing whether Mr. Long could have fired a gun with his injured hand and revealing what the crime scene looked like at night, there is no reasonable probability that the outcome of his trial would have been different.

In addressing Mr. Long's ineffective assistance of counsel claim, we ap-

ply familiar legal standards. " 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Cosio v. United States,* 927 A.2d 1106, 1122 (D.C.2007) (quoting *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Appellant must show both deficient performance and prejudice. With respect to deficient performance, he must demonstrate that "his trial counsel committed errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Brown v. United States,* 934 A.2d 930, 943 (D.C.2007) (citing *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052) (internal quotation marks omitted). We " 'must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.' " *Brown, supra,* 934 A.2d at 943 (quoting *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. 2052). " 'Trial tactical decisions generally do not result in a finding of ineffective assistance of counsel.' " *Brown, supra,* 934 A.2d at 943 (quoting *Zanders v. United States,* 678 A.2d 556, 569 (D.C.1996)). We "will not second-guess trial counsel's strategic choices because '[m]any alternative tactics are available to defense attorneys and their actions are often the products of strategic choices made on the basis of their subjective assessment of the circumstances existing at trial.' " *Brown, supra,* 934 A.2d at 943 (alteration in original) (quoting *Zanders, supra,* 678 A.2d at 569) (other citation omitted).

■■ As for prejudice, appellant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052, and that "but for counsel's unprofessional errors, [there is a reasonable probability] that the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. 2052. Moreover, *Strickland* cautions that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. 2052. This is so because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* (citation omitted).

■ We focus first on Mr. Long's contention regarding the trial court's alleged error:

The court erred when it determined that trial counsel was not ineffective but, rather, made a "strategic decision" or "tactical decision,: when he failed to call [Mr.] Plummer to testify and failed to introduce [Mr.] Plummer's prior sworn testimony at [Mr. Long's] second trial. [Mr.] Plummer's testimony was essential to counter the testimony of the critical prosecution witness, [Mr. Tilghman], who testified he was with [Mr. Long] when [Mr.] Long shot and killed [Mr.] Williamson.

Initially, based on our reading of the trial transcripts, we disagree with Mr. Long's characterization of Mr. Tilghman as "the critical prosecution witness." Obviously, he paints Mr. Tilghman as "the critical prosecution witness" in order to magnify the importance of Mr. Plummer's testimony as a rebuttal to Mr. Tilghman's identification of Mr. Long as the shooter.

In closing arguments at both Mr. Long's first and second trials, the government emphasized the eyewitness testimony of Linn Thomas (Mr. Williamson's mother), Angela Wheeler, and Florence Green. De-

fense counsel sought to impeach these witnesses,[9] and to stress Mr. Tilghman's importance to the case. According to the government's proof, Ms. Thomas saw Mr. Long standing over her son with a gun in his right hand (Mr. Tilghman is left-handed) and he pointed the gun directly at her. Angela Wheeler told the grand jury that she saw both Mr. Long and Mr. Tilghman and Mr. Williamson at the time of the shooting, and that Mr. Long was the shooter. When Ms. Green heard gunshots, she looked into the alley and saw Mr. Long running from the alley toward her apartment. During the first trial, the prosecutor stated in rebuttal that Mr. Tilghman "is not our key witness." In her rebuttal in the second trial, the prosecutor stated that Mr. Tilghman had lied in the case and admitted his responsibility. She also re-emphasized the separate and independent identifications of the shooter by Ms. Thomas, Ms. Wheeler, and Ms. Green. Thus, as a threshold matter, we cannot agree with Mr. Long (in his effort to stress the importance of Mr. Plummer's testimony) that Mr. Tilghman was "the critical prosecution witness."

Furthermore, we are not convinced by Mr. Long's effort to undermine the trial court's determination that Mr. Baer made a strategic decision not to call Mr. Plummer at Mr. Long's second trial, or to introduce the transcript of his testimony at the first trial. Mr. Long's second trial was quite different from the first trial due to the added conspiracy charge after the first trial. At the outset of the second trial, the trial judge informed the jury of the

charges in the indictment, the first of which was the conspiracy charge—that "[Mr.] Long and another person ... did knowingly and willfully combine, conspire, confederate and agree together to murder [Mr.] Williamson...." In delivering her closing argument, the prosecutor identified two possible theories of Mr. Long's guilt. The main government theory was the conspiracy—Mr. Long decided to kill Mr. Williamson and to accomplish the killing, he asked Mr. Tilghman to help him and entered into an agreement with Mr. Tilghman. According to the government's proof, overt acts committed to accomplish the conspiracy included the fact that Mr. Tilghman and Mr. Long armed themselves with a loaded firearm on March 18, 1996, the day before Mr. Williamson's murder; Mr. Long instructed Mr. Tilghman to retrieve the loaded firearm on March 19, which he did; and both men went to the alley on the night of the murder where Mr. Tilghman gave Mr. Long the loaded firearm; Mr. Long shot Mr. Williamson, and he pointed the firearm at Ms. Thomas with his right hand. The prosecutor identified the government's alternative theory as: Mr. Long "is the shooter, the principal. He is the person that shot and killed Ronald Williamson."

We are satisfied that Mr. Baer made a strategic decision not to call Mr. Flowers, Mr. Hunter, Mr. Plummer, and others as witnesses at the second trial. At the § 23–110 hearing, he identified three reasons for his decision: (1) their assertion of the Fifth Amendment, *and* (2) his skepticism "about whether they were telling the

---

9. Defense counsel argued in closing that Ms. Thomas did not immediately identify Mr. Long as the shooter and that she could not tell who was the shooter, and she used cocaine; although Ms. Wheeler said she saw Mr. Long shoot Mr. Williamson, she acknowledged on cross-examination that it was dark, she was sleepy, and she could not tell who did

the shooting, and her mother testified that she was not in the bedroom facing the alley and hence could not have seen the shooting; and while Ms. Green testified that she was certain that the man she saw running in the alley on the night of the shooting was Mr. Long, she told the detective the morning after the shooting that the man looked like Mr. Long.

truth," and (3) their serious criminal charges and convictions which would cast doubt on their credibility. Indeed, the trial court discredited the testimony of all of the defense witnesses at the D.C.Code § 23–110 hearing. Moreover, at the time of Mr. Long's second trial, Mr. Flowers, Mr. Stewart, Mr. Andrews, Mr. Hunter, and Mr. Plummer all either had been convicted of first-degree murder, or were awaiting trial on first-degree murder charges, and all had been incarcerated at the D.C. Jail.

Not only was Mr. Baer skeptical about the veracity of the potential witnesses that Mr. Long wanted to call, but he also was troubled by the prosecutor's cross-examination of Mr. Plummer at Mr. Long's first trial. In that cross-examination, the government began by posing questions which placed Mr. Plummer in the D.C. Jail, juvenile block, with Mr. Tilghman, Mr. Hunter, and Mr. Littlejohn, and with speaking access to the adult block where Mr. Long was housed. The government then turned to an alleged grievance complaint that Mr. Plummer had filed in 1997, indicating that other inmates were feeling his body; and posed further questions suggesting that because of his harassment and intimidation at the Jail, two men told him "to go after [Mr.] Tilghman," and he did. The prosecutor next focused on the shoes Mr. Plummer had worn to court, accused Mr. Plummer of stealing the shoes, and asked whether he told Mr. Tilghman, "I just took your shoes because we were suppose[d] to kill you." At the D.C.Code § 23–110 hearing, Mr. Baer said that the content of the cross-examination "was quite a surprise to [him]" and that Mr. Plummer's alleged involvement in the "plot to potentially stab" Mr. Tilghman "hurt [Mr. Plummer's] credibility."

 Mr. Long claims prejudice because Mr. Baer did not challenge "Mr. Plummer's assertion of privilege at the second trial or, in the alternative, ... introduce [Mr.] Plummer's prior sworn testimony into evidence at the second trial." [10] Our dissenting colleague disagrees with the trial court's stated belief that "[Mr.] Plummer could assert a valid claim of privilege." However, Mr. Plummer testified at the § 23–110 hearing that his own attorney advised him not to testify. Moreover, as we previously pointed out, in response to his own attorney's question, during the D.C.Code § 23–110 hearing, Mr. Long recounted the reasons Mr. Baer had given him for not calling Mr. Plummer to testify at Mr. Long's second trial:

He [Mr. Baer] said he did not put Mr. Plummer on the stand because of allegations that Mr. Plummer had stole [Mr.] Til[gh]man's tennis shoes and certain things and he said my association with [Mr.] Plummer makes me look bad because they're trying to say that I was sending guys to threaten [Mr.] Tilghman and trying to say obstruction of justice. So he said me being associated with the guys, he wouldn't call them for a witness.

In addition, Mr. Long stated that Mr. Baer "was adamant ... that my being associat-

---

10. We are unpersuaded by Mr. Long's arguments regarding Mr. Baer's investigation of Mr. Long's hand injury, and the lack of nighttime photographs of the crime scene. Mr. Baer interviewed the doctor at the D.C. Jail who indicated that the hand injury would not prevent Mr. Long from firing a gun. Nighttime photographs of the crime scene taken long after the crime was committed might not accurately reflect the scene on the night of the actual crime. At any rate, and even assuming deficient performance by trial counsel, in light of the testimony of the government's eyewitnesses, which the jury could credit, we see no "reasonable probability that the result of the proceedings would have been different." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052.

ed with this guy with allegations of me trying to witness tampering and threatening him, that he didn't want to put him on the stand." As we also established earlier in this opinion, the record reflects at least three reasons why Mr. Baer did not call Mr. Plummer, Mr. Hunter, and Mr. Flowers as witnesses at Mr. Long's second trial; the Fifth Amendment privilege was only one of those reasons. Indeed, the testimony of both Mr. Long and Mr. Baer at the § 23–110 hearing reveals that Mr. Baer was deeply concerned about the veracity of Messieurs Plummer, Flowers, and Hunter, and the impact on their credibility of their felony convictions, which included first-degree murder.

As the trial court recognized, Mr. Baer made a strategic choice, or a tactical decision, not to present Mr. Plummer as a witness at the second trial. The cross-examination of Mr. Plummer (and any of the other men who were housed at the D.C. Jail at the same time as Mr. Long) undoubtedly would have been vigorous and would have focused on the alleged harassment of Mr. Plummer and the alleged plot against Mr. Tilghman. Moreover, the government indubitably would have insisted that the full transcript of Mr. Plummer's testimony be introduced, rather than just the direct examination testimony. With Mr. Baer's focus, at the time of the second trial, on the harmful nature of the government's cross-examination of Mr. Plummer at the first trial and his credibility, it is understandable that he could not recall whether he considered reading Mr. Plummer's testimony into the record at the second trial. Nevertheless, Mr. Baer remarked at the § 23–110 hearing, that "all of [Mr. Plummer's] testimony would have come in." Therefore, it is unlikely that he would have considered introducing the transcript of Mr. Plummer's trial testimony.

Our case law is clear that " '[t]rial tactical decisions generally do not result in a finding of ineffective assistance of counsel.' " *Brown, supra,* 934 A.2d at 943 (quoting *Zanders, supra,* 678 A.2d at 569); *see also Strozier v. United States,* 991 A.2d 778, 787 (D.C.2010) ("[S]trategic choices ... will seldom if ever be wanting.") (first alteration in original) (quoting *Strickland, supra,* 466 U.S. at 681, 104 S.Ct. 2052 (internal quotation marks omitted)). As we reiterated in *Strozier,* "[b]ecause advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." 991 A.2d at 787 (citing *Strickland, supra,* 466 U.S. at 681, 104 S.Ct. 2052) (internal quotation marks omitted). Here, Mr. Baer made a clear strategic choice and on this record, we cannot say that Mr. Baer's strategic choice not to present Mr. Plummer as a witness constituted ineffective assistance of counsel. *See Brown, supra,* 934 A.2d at 943 ("This court will not second-guess trial counsel's strategic choices because [m]any alternative tactics are available to defense attorneys and their actions are often the products of strategic choices made on the basis of their subjective assessment of the circumstances existing at trial." (internal quotation marks and citation omitted)). In sum, we affirm the trial court's judgment denying Mr. Long's D.C.Code § 23–110 motion.

### Mr. Long's Sentence

Mr. Long argues that the trial court's sentence is unconstitutional in light of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because the trial court found three aggravating factors that were not determined by the jury: (1) the murder was "especially heinous," (2) the crime involved substantial planning, and (3) the victim was "vulnera-

ble" because of his age (14). We conclude that Mr. Long is procedurally barred from raising this argument, and even if he were not, his argument is still unpersuasive because *Apprendi* does not apply retroactively.

We first examine the relevant procedural history of the sentencing issue. The trial court sentenced Mr. Long on September 4, 1998, to concurrent terms; it imposed a prison term of life without parole for the first degree murder while armed conviction, and lesser terms for the other charges. Mr. Long first raised his *Apprendi* arguments via a *pro se* motion to correct his sentence pursuant to Super. Ct.Crim. R. 35(a),[11] on July 27, 2004, after his counsel had filed his first § 23–110 motion in 2003, and during the pendency of his direct appeal. He argued that his sentence was illegal because "[t]he jury which deliberated [his] case held no knowledge of these aggravating factors." The trial court issued an order denying his *pro se* motion on August 9, 2004, and Mr. Long did not appeal that order. The trial court later denied his § 23–110 motion without a hearing on November 15, 2004. Mr. Long filed a notice of appeal for that denial on November 29, 2004. The collateral case was ultimately consolidated with his direct appeal, which resulted in our decision in *Long I, supra.*

When we decided Mr. Long's consolidated appeal in 2006, *Long I,* "we d[id] not reverse Mr. Long's convictions outright, but we vacate[d] the order denying his § 23–110 motion and remand[ed] the case to the Superior Court for further proceedings on the motion in accordance with our opinion." *Long I, supra,* 910 A.2d at 310–11. Later, on April 15, 2008, Mr. Long's new counsel (Mr. Heslep) filed a renewed motion for correction of sentence, repeat-

ing his argument that the trial judge, "not the jury, made the factual findings to support the enhanced sentence of life without parole." On June 24, 2008, the government filed an opposition to the renewed motion.

On December 11, 2008, after holding an evidentiary hearing, the court issued an order on Mr. Long's § 23–110 motion pursuant to our instructions on remand. However, the trial court took no action on Mr. Long's renewed motion to correct his sentence, and he filed a notice of appeal on December 15, 2008. We subsequently remanded the record to the trial court "with directions to rule, on an expedited basis, on the defendant's renewed motion to correct his sentence or, in the event that the trial court has previously ruled on this motion, to memorialize the previous ruling in writing." Judge Christian entered an order dated January 7, 2011, which denied Mr. Long's renewed motion. The judge attached her 2004 order, indicated that Mr. Long did not appeal that order, stated that the 2004 order addressed all of Mr. Long's contentions, and that he had raised no "additional evidence" in his renewed order.

■ As a threshold matter, we do not believe that Mr. Long's sentence is illegal within the meaning of Rule 35, as he claims. Rule 35(a) specifies that: "The Court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence." In *Ruffin v. United States,* 25 A.3d 1 (D.C.2011), we reiterated the distinction between an illegal sentence and a sentence imposed in an illegal manner.

An illegal sentence within the meaning of Rule 35(a) is a sentence that is inconsistent with the defendant's conviction,

---

**11.** Mr. Long cited "D.C.Code § Rule 35(a)" as the grounds for his motion, but the context of his motion makes clear that he intended to cite Super. Ct.Crim. R. 35(a).

and that exceeds the limits authorized by the relevant statute, even if there was no irregularity in the sentencing proceeding. By contrast, a sentence imposed in an illegal manner is one that reflects defects in the process or proceedings prior to the imposition of the sentence.

25 A.3d at 4–5 (citations and internal quotation marks omitted). A sentence imposed in an illegal manner generally is subject to the 120–day time limitation reflected in Rule 35(b); the motion must be made "not later than 120 days after the sentence is imposed ..., or not later than 120 days after receipt by the Court of a mandate issued upon affirmance of the judgment ...., or not later than 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction...." Rule 35(b). Mr. Long's motion to correct sentence was based on his assertion that the judge rather than the jury made the *Apprendi* findings. Thus, his actual claim is that his sentence was imposed in an illegal manner, and it is subject to the 120–day time limitation of Rule 35(b).

Whether Mr. Long's renewed motion runs afoul of the 120–day time limitation in Rule 35(b) depends on whether it is characterized as a new motion or merely as a memorialization of his 2004 motion. When we remanded Mr. Long's case to the trial court in 2006, after deciding *Long I*, we "return[ed it] ... to the trial court for all purposes." *Bell v. United States*, 676 A.2d 37, 41 (D.C.1996). Mr. Long filed his renewed motion for correction of sentence on April 15, 2008, prior to the commencement of his remand evidentiary hearing on his D.C.Code § 23–110 motion. Thus, at the time that Mr. Long filed his renewed motion, we "retain[ed] no jurisdiction over the case"; jurisdiction remained with the trial court. *See id.* On December 15, 2008,

Mr. Long appealed the trial court's denial of his D.C.Code § 23–110, motion, and his case returned to this court. However, because the trial court had not addressed the renewed sentencing motion, we remanded the record, at which point we retained "jurisdiction over the case...." *Id.*

■ Arguably, under these circumstances, the trial court's 2011 order denying Mr. Long's renewed motion technically was a new order. But, it could be characterized as nothing more than a memorialization of the 2004, order since "[t]he point of such a remand is to give the trial judge the opportunity to complete or clarify the record so that this court will have an adequate basis for review of the trial court's rulings." *Id.* Characterizing the trial court's 2011 order as a mere memorialization of the court's 2004 order gives us some pause, however, because Mr. Long failed to appeal the 2004 order and did not lodge his renewed motion until four years later. Nevertheless, we are satisfied that Mr. Long's 2004 motion and his 2008 renewed motion were procedurally barred for the reasons set forth below.

■ We have stated that "[w]here a defendant has failed to raise an available challenge to his conviction on direct appeal, he may not raise that issue on collateral attack unless he shows both cause for his failure to do so and prejudice as a result of his failure." *Head v. United States*, 489 A.2d 450, 451 (D.C.1985). Mr. Long did not raise the *Apprendi* issue in his direct appeal, or his first § 23–110 motion, nor did he appeal the denial of his first Rule 35 challenge in 2004. He acknowledges that the sole purpose of our remand of the case in 2006 was "for a hearing on [his] § 23–110 motion." He complains that his "appellate counsel did not raise this issue [pertaining to *Apprendi* ] above," yet, he fails to articulate the

cause of, and any prejudice resulting from, his counsel's failure to do so. Moreover, his arguments in his renewed motion encompassed the same arguments contained in his original motion, the denial of which he failed to appeal four years earlier. As "[s]ection 23–110 is not designed to be a substitute for direct review," *id.*, we cannot agree that Mr. Long's "motion remains ripe for resolution" on collateral attack.[12]

 Despite the procedural bar, Mr. Long urges us to reach the merits of his claim. Even if we were not foreclosed from reviewing Mr. Long's sentencing challenge, the government argues that his claim is barred because *Apprendi* does not apply retroactively. In *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the Court declared that while "[n]ew *substantive* rules generally apply retroactively" (emphasis in original), "[n]ew rules of procedure ... generally do not apply retroactively." *Id.* at 351–52, 124 S.Ct. 2519. The Court clearly stated that "rules that regulate only the *manner of determining* the defendant's culpability are procedural." *Id.* at 353, 124 S.Ct. 2519 (citing *Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)).

*Apprendi* addressed "the adequacy of [sentencing] *procedure,*" not "the substantive basis for [sentencing] enhancement[s]." *Apprendi,* supra, 530 U.S. at 475, 120 S.Ct. 2348 (emphasis added). Federal courts consistently have concluded that "*Apprendi* is about nothing but procedure—who decides a given question (judge versus jury) and under what standard (preponderance versus reasonable doubt)." *Curtis v. United States,* 294 F.3d 841, 843 (7th Cir.2002); *see also United States v. Swinton,* 333 F.3d 481, 488 (3d Cir.2003) ("The courts of appeal that have consid-

ered this issue have held that *Apprendi* establishes a procedural rule."). The Court has recognized an exception allowing retroactive application for a new rule of criminal procedure, but that exception has very limited application. The Court "give[s] retroactive effect to only a small set of watershed rules ... implicating the fundamental fairness and accuracy of the criminal proceeding." *Schriro, supra,* 542 U.S. at 352, 124 S.Ct. 2519 (internal quotation marks and citations omitted). We conclude, as have federal courts, that "the rule in *Apprendi* is not a 'watershed' rule that improved the accuracy of determining the guilt or innocence of a defendant[;] [r]ather, the accuracy improved by *Apprendi* is the imposition of a proper sentence, and *Apprendi* did not alter our understanding of bedrock elements essential to a fundamentally fair proceeding." *Swinton, supra,* 333 F.3d at 490 (citing *United States v. Brown,* 305 F.3d 304, 309 (5th Cir.2002)); *see also United States v. Moss,* 252 F.3d 993, 997 (8th Cir.2001).

In sum, like the federal courts, we conclude that *Apprendi* is neither a substantive rule nor a watershed rule of criminal procedure, and it does not apply retroactively to cases on collateral review. *Apprendi* was decided in 2000, after Mr. Long's conviction became final, and he cannot pursue this issue on a collateral attack. Thus, even if his claim was not procedurally barred, his challenge would fail.

Accordingly, for the foregoing reasons, we affirm the trial court's judgment of conviction, and its judgment denying Mr. Long's D.C.Code § 23–110 motion. We also affirm the trial court's denial of Mr. Long's Super. Ct. Civ. R. 35 renewed motion for correction of sentence.

*So ordered.*

---

**12.** We note that Mr. Long could have pursued this challenge in his direct appeal, as the appellant did in *Keels v. United States,* 785 A.2d 672 (D.C.2001).

SCHWELB, Senior Judge, dissenting:

At Long's first trial, Michael Plummer testified that Long's codefendant, William Tilghman, admitted that it was he (Tilghman) who killed the decedent, that Long was innocent, and that he (Tilghman) had decided to place the blame on Long. The first trial ended with a hung jury with respect to the principal charges.

At Long's second trial, Plummer's counsel indicated that his client proposed to invoke his privilege against self-incrimination and refuse to testify. Whatever the merit or lack thereof of this proposed assertion of the privilege may have been, *see infra* p. 388, it is undisputed, and indeed indisputable, that Long had the right to introduce into evidence a transcript of Tilghman's first trial testimony (both the direct and cross-examination) and to have it read to the jury. Long's attorney, Mitchell Baer, did not attempt to introduce this evidence, and Long was convicted of all charges. Long contends that his attorney's failure to present this potentially powerful exculpatory evidence constituted ineffective assistance of counsel.

The government contends, the trial court held, and my colleagues in the majority now appear to agree, that Baer made a "strategic" or "tactical" decision not to present Plummer's first trial testimony, and that this decision is therefore largely insulated from our review. The record demonstrates beyond peradventure, however, that Baer did not make, and could not have made, a strategic or tactical decision with respect to this point because, as he effectively acknowledged on the witness stand, he did not make any decision at all. Specifically, Baer admitted, under cross-examination by Long's attorney, that the introduction of a transcript of Plummer's testimony into evidence probably

had not even occurred to him, that he did no research on the issue, and that he did not discuss the matter with his client. It is surely self-evident that a lawyer cannot have declined to take a course of action for strategic or tactical reasons when he was, by his own admission, unaware that the course of action was available to him or that there was a decision on the matter to be made.

In my view, counsel's decision-making at trial notwithstanding lack of preparedness on such a major issue satisfies the "deficient performance" prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The question whether Long has made the requisite showing of prejudice is closer, but for the reasons stated in detail below, I do not believe that this court can have the requisite "confidence" in the verdict. Accordingly, I respectfully dissent.

## I.

## BACKGROUND

### A. *Procedural history*

Because the factual and legal issues presented are somewhat complex, I have found it necessary to describe them in some detail. This case arises out of the shooting death of fourteen-year-old Ronald Williamson on March 19, 1996. Both Long and Tilghman were charged, *inter alia,* with first-degree murder while armed. Tilghman entered a plea of guilty to voluntary manslaughter while armed, and he testified against Long. At Long's first-trial in March 1998, the jury was unable to reach a unanimous verdict with respect to the principal charge of armed premeditated murder and two related counts.[1]

On April 15, 1998, following Long's inconclusive first trial, a grand jury returned

---

1. The jury found Long guilty of carrying a pistol without a license (CPWOL).

a superseding indictment, adding a new charge of conspiracy to commit armed first-degree premeditated murder. At his second trial, in June 1998, Long was convicted of the murder charge, as well as of conspiracy to commit that offense. Long was sentenced to life imprisonment without parole. On December 24, 2003, more than five years after his conviction, Long, through a new attorney, filed a motion pursuant to D.C.Code § 23–110 to vacate his conviction on the ground that his trial counsel had been constitutionally ineffective. The trial judge[2] denied the motion without a hearing.

Long appealed to this court from his convictions and from the denial of his § 23–110 motion. In *Long v. United States*, 910 A.2d 298 (D.C.2006) (*Long I*), we affirmed Long's conviction on direct appeal, but we vacated the denial of his § 23–110 motion and remanded the case to the trial judge with directions to hold a hearing with respect to Long's claim of ineffective assistance of counsel. On December 11, 2008, following evidentiary hearings in April and August 2008, the trial judge denied the motion in a written order.

Long now appeals from the trial court's order denying his § 23–110 motion. He contends that his attorney was ineffective, *inter alia*, by failing to present to the jury at the second trial the testimony given at Long's first trial by Michael Plummer.[3] According to Plummer, as we have noted, Tilghman, admitted to Plummer that it was he (Tilghman) and not Long who shot and killed Williamson, and that he (Tilghman) had decided to place the blame, falsely, on Long. Long further claims that the trial judge's key findings lacked support in the evidence and that the judge made prejudicial and dispositive errors of law.[4]

2. This case has been before three Superior Court judges. Judge Harold Cushenberry presided over Long's first trial. Judge Nan R. Shuker presided over his second trial. Judge Kaye K. Christian heard and decided Long's § 23–110 motion. Except where otherwise specified, references in this dissenting opinion to the trial judge are to Judge Christian.

3. Long also asserts, *inter alia*, that his sentence was illegal in contravention of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In light of my conclusion that Long's conviction should be set aside for constitutionally ineffective assistance of counsel, I do not reach the *Apprendi* issue. I likewise do not address Long's claim that Baer's performance was deficient in relation to issues other than those related to counsel's failure to introduce into evidence at the second trial a transcript of the testimony of Michael Plummer at the first trial.

4. I think it important to note that on several issues in the case, Baer advocated zealously and resourcefully on his client's behalf. Baer succeeded, *inter alia*, in persuading the trial judge to suppress Long's statement to the police, in which Long had admitted shooting Williamson. Baer also vigorously cross-examined the prosecution witnesses, and he elicited damaging admissions from several of them, including Tilghman and the decedent's mother. The government emphasizes (and Long's appellate counsel does not challenge) the high quality of much of Baer's representation of Long, and argues in its brief, citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, that "the constitutional adequacy of defense counsel's representation must be viewed in light of counsel's total performance." But as government counsel acknowledged at oral argument, "the type of breakdown in the adversarial process that implicates the Sixth Amendment is not limited to counsel's performance as a whole-specific errors and omissions may be the focus of a claim of ineffective assistance as well." *United States v. Cronic*, 466 U.S. 648, 657 n. 20, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (citing *Strickland*, decided on the same day, 466 U.S. at 693–96, 104 S.Ct. 2052). Thus, "the right to effective assistance of counsel ... may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). It is my view that in this case, trial counsel, a highly competent attor-

## II.

### THE TRIAL COURT PROCEEDINGS

#### A. *Long's second trial*

The evidence for the prosecution at Long's second trial was concisely summarized by the trial judge, in her order denying Long's § 23–110 motion, as follows:

Fourteen-year-old Ronald Williamson was killed after being shot five times in the body and head in an alleyway on 21st Street, NE, Washington, D.C., on March 19, 1996. According to the evidence presented by the government, Ronald Williamson and friends had threatened the Defendant at gun point, struck the Defendant on the head with the gun and stomped on the Defendant's Super Nintendo video system. *Long v. United States*, 910 A.2d 298, 301 (D.C. 2006). Approximately two weeks later, the Defendant and William Tilghman tracked Ronald Williamson to an alley to seek revenge. *Id.* According to the testimony of William Tilghman, the Defendant told Ronald Williamson to turn around because someone was coming through the cut. *Id.* Once Ronald Williamson turned, the Defendant directed Mr. Tilghman to shoot. *Id.* When Mr. Tilghman hesitated, the Defendant grabbed the gun from Mr. Tilghman and proceeded to fire off half a dozen shots at Ronald Williamson himself. *Id.* After running out of ammunition, the Defendant proceeded to hit Ronald Williamson on the head with the gun and then walked up the alley to get more bullets from a box hidden under a porch. *Id.* at 302. At this point, Ronald Williamson was lying on his stomach and struggling to crawl. *Id.* The Defendant returned to the alley after reloading his gun, stood over Ronald Williamson and shot him one more time.[5]

Based on this evidence, and notwithstanding important admissions and contradictions by several of the prosecution witnesses, including Tilghman, *see Long I*, 910 A.2d at 310, Long was convicted of armed premeditated murder, conspiracy, and three related assault or weapons offenses. *Id.* at 301. On September 15, 1998, Long was sentenced to life imprisonment without parole for armed first-degree murder and to shorter concurrent terms on the other charges. Long appealed from his convictions, but in *Long I*, this court rejected his various contentions on direct appeal. *Id.* at 301–06.

#### B. *Plummer's testimony at Long's first trial*

Under circumstances described in more detail below, Michael Plummer was not called as a witness at Long's second trial, in part because Baer took the position that Plummer, his potential star witness, had a Fifth Amendment privilege. At the first trial, however, Plummer, who was sixteen years old at the time of Williamson's murder, testified for the defense. Plummer and Tilghman were both incarcerated in the juvenile cell block of the District of Columbia Jail between January and July 1997. According to Plummer, Tilghman told him and other prisoners, on several occasions, that he had murdered Williamson (who, despite his youth, was known as Man–Man). Tilghman told Plummer that Man–Man had harassed Tilghman and pulled guns on him, that he (Tilghman)

---

ney, nevertheless made a critical and prejudicial error by failing to introduce, or even to consider introducing, Plummer's first trial testimony, and that the trial judge erred in holding to the contrary.

5. The facts adduced at trial are set forth in greater detail in our opinion in *Long I*, 910 A.2d at 301–02, 310, and I incorporate that recitation by reference.

had grown tired of Man–Man, and that he had killed Man–Man. Tilghman also informed Plummer, according to the latter's account, that Tilghman planned to pin the murder on his codefendant, whom Tilghman called "Meatball," so that he (Tilghman) could "beat the case," or at least "get shorter time." Subsequently, Plummer was transferred to the adult cell block, where he met "Meatball," who turned out to be the defendant Colie L. Long.

On cross-examination, the prosecutor posed questions suggesting that Plummer had filed a complaint alleging that other prisoners had sexually harassed him, that he (Plummer) had gone after Tilghman to keep other prisoners "off of Plummer," that Plummer had stolen Tilghman's red and black Air Baker shoes, that Plummer was wearing the stolen shoes while testifying at Long's trial, and that Plummer had told Tilghman that Tilghman should be glad that Plummer did no more than take Tilghman's shoes because "we were suppose[d] to kill" Tilghman. Plummer emphatically answered all of these questions in the negative, denied that he had signed a harassment complaint ostensibly bearing his signature, and rejected the assumptions on which the prosecutor's questions were based.

Tilghman was re-called by the prosecution on rebuttal. He testified that Plummer stole Tilghman's shoes, that Plummer admitted that he had done so, and that Plummer told him that he (Tilghman) should be glad that Plummer had only taken his shoes, because Plummer was "supposed to have stabbed [Tilghman]." The government presented no evidence to support its apparent suggestion, implicit in the prosecutor's questions, that Plummer was afraid of sexual harassment by other prisoners.

At the conclusion of the first trial, at which Plummer had testified, the jurors convicted Long only of CPWOL, but they were unable to reach a unanimous verdict as to the armed murder charge. The charge of conspiracy to commit murder was not before the jury in the first trial. At the second trial, at which Plummer did not testify, Long was convicted of conspiracy and of armed first-degree murder and related offenses.

C. *The § 23–110 motion*

(1) *Procedural Background*

On Christmas Eve 2003, more than five years after his sentence was imposed, Long, acting through new counsel, filed a motion to vacate his conviction, claiming ineffective assistance of trial counsel. On November 15, 2004, the trial judge assigned to the motion (who, as we have seen, had not presided over either of Long's trials) denied the motion without a hearing. Long appealed, and his appeal from his 1998 conviction was consolidated with his appeal from the 2003 order denying his motion. On November 9, 2006, in *Long I*, 910 A.2d at 306–10, this court reversed the denial of Long's § 23–110 motion and held that Long was entitled to an evidentiary hearing.

At the hearing, which was held in April and August 2008, Long claimed that his trial counsel had been constitutionally ineffective in a number of different respects. *See Long I*, 910 A.2d at 307 (describing allegations in Long's motion). On December 11, 2008, the trial judge issued a twenty-five page order in which she concluded that Baer's representation of Long had not been deficient, and she once again denied Long's motion. Long then filed the instant appeal. Although Long has based his current appeal on a number of grounds and also contends that his sentence of life imprisonment without parole is illegal, I address only one of his claims of ineffec-

tive assistance, namely, that his attorney failed to present to the jury Plummer's exculpatory testimony by reading to the jury at Long's second trial the testimony that Plummer had given at the first, or by introducing into evidence a transcript of that testimony.

### (2) *The evidence at the hearing*

Long's evidence at the § 23–110 motions hearing is summarized in the majority opinion, and I do not repeat it here. The government's sole witness at that hearing was Mitchell Baer. Baer, a veteran criminal defense attorney who had practiced law since 1982, testified, *inter alia,* that Long was a difficult client who had been dissatisfied with several other attorneys who had previously represented him. According to Baer, Long urged him to present testimony which Baer believed to be untrue. Baer moved to withdraw from the case on ethical grounds, and he consulted with Bar Counsel on the subject. Ultimately, however, in conformity with Bar Counsel's advice, Baer represented Long at both trials.

Baer, as I have noted, had called Plummer as a defense witness at Long's first trial, and a significant part of the questioning of Baer at the hearing of the § 23–110 motion was addressed to the question why Plummer's evidence was not presented to the jury at Long's second trial, either by calling Plummer as a witness or by introducing the transcript of Plummer's testimony at the first trial. This issue was important, for Plummer was the only witness at the first trial whose testimony directly supported Long's theory of the case, namely, that Tilghman, not Long, committed the murder, and that Tilghman had acknowledged falsely placing the blame on Long, an innocent man, in order to help his own cause.

Baer testified that he did not call Tilghman as a witness at Long's second trial, in part, because he believed, in the wake of the prosecutor's cross-examination of Plummer at the first trial, that Plummer had a Fifth Amendment privilege not to testify. Baer told the court that in his view, Plummer's having testified at the first trial could not be considered a knowing waiver of the privilege against self-incrimination because, according to Baer, Plummer had not been aware of the government's apparent allegations against him (gleaned from the prosecutor's questions to Plummer on cross-examination) before he testified at the first trial.[6]

Baer was then cross-examined with respect to the potential utility to the defense of Plummer's evidence and, especially, regarding the possibility, if Plummer was unavailable at the second trial, of introducing Plummer's testimony from the first:

A. I was going to say, one of the issues that came up in the first trial was that the government was asking questions about some kind of a conspiracy to get Mr. Tillman and that a number of these—and that there were—I believe the government indicated that for the second trial that they were going to pursue that line

---

**6.** At the second trial, after Baer had advised the presiding judge, Hon. Nan R. Shuker, that he believed that Plummer had a Fifth Amendment privilege, the judge remarked that "if I remember the law, if someone voluntarily takes the witness stand, they [sic] kind of waived it." The judge was quite correct. *See, e.g., Hale v. United States,* 361 A.2d 212, 216 n. 8 (D.C.1976). Baer responded, however, that Plummer's attorney had told him that Plummer would "assert [the] Fifth Amendment" and, in Baer's words, *"it seems to me there was no knowing waiver."* (Emphasis added.) Baer was thus arguing *against* his right at Long's second trial to call his arguably most important witness from the first trial. The judge directed Baer to proceed as he saw fit.

of cross-examination with regard to the other witnesses, other than Mr. Plummer.

Q. All right. But [the prosecution] had already pursued that line of cross-examination against Mr. Plummer; correct?

A. Correct.

Q. And in fact that was at the first trial which ended, at least as to the murder charge, in a hung jury; correct?

A. Correct.

Q. All right. And so that line of examination, at least insofar as to Mr. Plummer, hadn't been a complete disaster; correct?

A. Correct.

Q. All right. And, in fact, then, once Mr. Plummer took the Fifth at the second trial, you were free, being as he was unavailable and had been confronted at the first trial, to read his testimony to the jury; correct?

A. That's probably correct.

Q. Did you consider that?

A. I can't recall if I considered it, but all of his testimony would have come in—

Q. Right. His entire testimony at the first trial which ended in a hung jury could have come in at the second trial, but it would [have] had to have been read in some way instead of given live. That's about the size of it; right?

A. That's—that may be correct. *I haven't researched that issue but that may be correct.*

Q. *Did it even occur to you at the time?*

A. *I can't recall if it occurred to me or not. It may not have occurred to me.*

Q. *And you didn't discuss it with Mr. Long, the possibility of putting in the cold transcript testimony?*

A. *I probably did not.*

(Emphasis added.) Baer thus admitted that, so far as he could recall, he did not make a strategic or tactical decision not to introduce Plummer's prior testimony. Indeed, as Baer effectively acknowledged, he was unaware that this alternative was open to him.

Plummer was one of several witnesses at the hearing who testified on Long's behalf.[7] Plummer repeated and elaborated upon the testimony he had given ten years earlier at Long's first trial. His evidence included the following exchange with Long's counsel:

Q. .... would it be fair to say that what he told you was that *he was going to frame an innocent man for murder?*

A. *Actually, he told me exactly that.*

\* \* \*

Q. And, so, he wasn't going around bragging about that to the whole world?

A. Actually, he did brag a lot.

(Emphasis added.) Plummer added that

once it got back to Mr. Long that me and William Tilghman were friends, he asked me would I speak to his investigator, and I agreed to it. *My conscience*

---

7. As noted by the majority, several other men who had been in the juvenile cell block had also claimed that Tilghman made admissions to them similar to those that he allegedly made to Plummer. For various reasons, which included Fifth Amendment issues and understandable doubts about the men's truthfulness, Baer did not call any of these individuals as witnesses for the defense. Long does not contend on appeal that Baer's decision not to present testimony from these men, all of whom had been convicted of murder or other major felonies, constituted ineffective representation.

*ate at me, because you shouldn't send an innocent man away or be held accountable, knowing that you committed the crime.*

(Emphasis added.)

On cross-examination, the prosecutor suggested, by the phrasing of his questioning of Plummer, that Plummer's account was improbable, in that one would not expect Tilghman (or any person) to boast publicly to his fellow-prisoners that he was planning to cause Long to be convicted of a murder of which Long was innocent and which Tilghman himself had actually committed. The prosecutor also repeated the questions posed to Plummer at Long's first trial regarding Plummer's alleged complaint of sexual harassment and his alleged theft of shoes from, and threats to, Tilghman, as well as Plummer's answers to these questions. Plummer once again emphatically denied the veracity of the claimed facts[8] on which the prosecutor's questions were based.[9] Tilghman reiterated on rebuttal the claim that Plummer had stolen his shoes and had told Tilghman that he should have been stabbed, but the government presented no other evidence to substantiate the predicate for the prosecutor's questions to Plummer on cross-examination. In *Long I*, this court recognized that Tilghman had given contradictory statements as to who shot the decedent, that he had been impeached with other prior inconsistent statements, and that he was of "suspect credibility." 910 A.2d at 310. Moreover, as noted by my colleagues, maj. op. at 373–74, *ante*, the prosecutor told the jury in rebuttal argument that Tilghman had lied under oath at Long's first trial.

### (3) *The trial judge's ruling*

In her comprehensive order, the trial judge considered and rejected each of Long's claims. The judge disbelieved much of the testimony presented on Long's behalf, and she found that Baer had effectively represented Long and had made reasonable strategic and tactical decisions. My sole focus here, however, is on the judge's resolution of Long's claim relating to his trial counsel's failure to present to the jury at the second trial Plummer's testimony at the first trial.

The judge addressed this issue twice in her order. First, in her Findings of Fact, the judge wrote:

Although Mr. Plummer testified on behalf of the Defendant during the first trial, the scenario developed by the government on cross-examination surprised Mr. Baer because he was not aware of this information. Mr. Baer did not believe that Mr. Plummer's cross-examination testimony during the Defendant's first trial would have benefited the Defendant in the second trial. Moreover, *Mr. Baer believed that once Mr. Plummer had asserted his Fifth Amendment privilege it was inappropriate to use Mr. Plummer's testimony from his first trial in the Defendant's second trial.* Based on these concerns, Mr. Baer decided against presenting Mr. Plummer's testimony from the first trial in the Defendant's second trial.

---

8. Plummer's redirect examination by Long's attorney included the following:

 Q. Mr. Plummer, did you steal William Tilghman's shoes and wear them to court in trial where you knew everybody might recognize them?

 A. No, sir. That would be ridiculous.

9. At the very same time that Long was being tried for the second time, Plummer was on trial for a different murder before another judge. Plummer's first trial, like Long's, had ended with a hung jury. Plummer was ultimately convicted a few days after Long's trial ended. At the time of the § 23–110 hearing, Plummer was still serving his sentence.

(Emphasis added.) In her Conclusions of Law, the judge elaborated on the same theme, as follows:

> Although Mr. Plummer testified in the Defendant's first trial, he too asserted his Fifth Amendment privilege and refused to testify in the Defendant's second trial. However, during Mr. Plummer's cross-examination by the government in the Defendant's first trial, it was revealed that allegations of a conspiracy between the men to harm or kill William Tilghman existed. In light of such negative testimony, *Mr. Baer made a strategic decision to forego the use of Mr. Plummer's previous testimony in the Defendant's second trial.* In addition, it appears that Mr. Baer was further convinced that having the men testify was not in the Defendant's best interests.

(Emphasis added.) The judge concluded that "Mr. Baer's decision with respect to this issue is not in error but rather a tactical decision favoring the Defendant," and that Long suffered no prejudice from Baer's "limiting the usage of Mr. Plummer's damaging testimony from the first jury trial."

## III.

## ANALYSIS

A. *Applicable legal principles*

The Sixth Amendment to the United States Constitution guarantees to every criminal defendant the effective assistance of counsel. *Strickland*, 466 U.S. at 685–86, 104 S.Ct. 2052. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052; *Curry v. United States*, 498 A.2d 534, 540 (D.C.1985). To prevail on a claim of ineffective assistance, Long must demonstrate (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694, 104 S.Ct. 2052; *see also Gamble v. United States*, 901 A.2d 159, 172 (D.C.2006); *Frederick v. United States*, 741 A.2d 427, 437 (D.C.1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The defendant is not required to *"prove* that [but for counsel's alleged errors or omissions][,] he would have been found not guilty." *Woodard v. United States*, 719 A.2d 966, 971 & n. 3 (D.C.1998) (emphasis in original; citation omitted).

As our full court reiterated in *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc), "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (Citations and internal quotation marks omitted). Counsel's representation of his or her client is presumed to be reasonable. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. In assessing claims of constitutionally deficient representation, the court will not second-guess debatable strategic or tactical decisions even if they appear, in hindsight, to have been unwise. *See, e.g., Ginyard v. United States*, 816 A.2d 21, 38–39 (D.C.2003).

" 'Strategic choices made *after thorough investigation of law and fact* relevant to plausible options are virtually unchallengeable.' " *Cosio*, 927 A.2d at 1123 (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052) (emphasis added). Ineffective representation is not limited to performance in the courtroom, and inadequate investigation

and preparation for trial may result in the denial to the defendant of his or her Sixth Amendment rights. *Cosio*, 927 A.2d at 1123. Constitutionally deficient trial preparation may involve the failure to identify and present reasonable legal contentions. *See, e.g., Mack v. United States*, 570 A.2d 777, 784 (D.C.1990) (failure to object to damaging hearsay evidence); *Quallis v. United States*, 654 A.2d 1281, 1282 (D.C. 1995) (failure to object to the introduction into evidence of an alleged incriminating statement which had not been provided to defense counsel during discovery). Moreover, as I have observed at the outset of this dissenting opinion, *see* note 4, *ante*, even isolated errors of counsel in an otherwise well-tried case may constitute ineffective assistance if they are sufficiently serious and prejudicial. *Murray*, 477 U.S. at 496, 106 S.Ct. 2639; *Cronic*, 466 U.S. at 657 n. 20, 104 S.Ct. 2039.

## B. *The deficient performance prong*

Long contends, *inter alia*, that Baer's performance at the second trial was constitutionally deficient because Baer neither called Plummer as a witness nor attempted to introduce into evidence the testimony that Plummer had given at the first trial. According to Long, Plummer's evidence was critically important because it constituted the only direct proof of Long's theory of the case, namely, that Tilghman, not Long, murdered the decedent; that Tilghman made a conscious decision to place the blame on Long, who was innocent; and that Tilghman had not only admitted that this was so, but had boasted about it to Plummer and other prisoners.

The trial judge, as I have explained, rejected this claim of ineffectiveness. With respect to Baer's failure to call Plum-

mer as a live witness, the judge found that Plummer asserted his Fifth Amendment privilege at the second trial and refused to testify.[10] To the extent that the judge believed that Plummer could assert a valid claim of privilege, I am constrained to disagree. " '[A] witness does not have the broader Fifth Amendment right that an accused does to decline even to take the stand.' " *Littlejohn v. United States*, 705 A.2d 1077, 1083 (D.C.1997) (quoting *In re D.R.*, 673 A.2d 1259, 1262 (D.C.1996)). "The witness's [Fifth Amendment] privilege ... applies only to those specific questions to which his answers would incriminate him." *Johnson v. United States*, 746 A.2d 349, 355 (D.C.2000) (internal quotation marks omitted). Generally, the court must permit examination out of the presence of the jury and rule on the assertion of privilege one question at a time. *Littlejohn*, 705 A.2d at 1083 (citations omitted). "A blanket privilege may be granted to the witness only when it is evident to the court that anything less will not adequately protect him." *Id.* (citations omitted).

In this case, Plummer had submitted to cross-examination during the first trial, and his answers did not incriminate him. Tilghman testified on rebuttal that Plummer stole his shoes and told Plummer that he should be glad that he had not been killed, but the government produced no additional evidence to support the allegations and suggestions contained in the prosecutor's cross-examination of Plummer, and Tilghman's testimony did not result in Plummer's conviction of armed murder. Although the prosecutor's questions at the first trial suggested that, according to the government, Plummer had stolen Tilghman's shoes and had indirectly

10. The record reveals that Plummer did not personally appear in the courtroom or refuse to testify. According to Baer, Plummer's at-

torney indicated to Baer that if called as a witness, Plummer would invoke the privilege.

threatened Tilghman, Plummer categorically denied these allegations.[11]

I now turn to what I regard as the dispositive issue, namely, whether defense counsel's failure to introduce into evidence at the second trial Plummer's testimony at the first trial constituted ineffective assistance. In denying Long's § 23–110 motion, as we have seen, the judge characterized this as "a *strategic decision* to forego the use of Mr. Plummer's previous testimony." (Emphasis added.) She also found that Baer had acted "not in error but rather [had made] a *tactical* decision favoring the Defendant." (Emphasis added.) My colleagues in the majority seem to agree. But whether Baer's failure to introduce into evidence Plummer's first trial testimony is characterized as "strategic" or "tactical," the record discloses that trial counsel made no decision at all regarding this point. In fact, as Baer testified, the availability of this alternative evidently did not occur to him. The excerpt from Baer's testimony reproduced at pp. 384–85, *ante,* reveals that counsel did not know, even at the § 23–110 hearing in 2008, whether he had the right at the second trial to read Plummer's first trial testimony to the jury, for he had evidently neither researched the issue nor discussed it with his client.[12] If, as he effectively acknowledged, Long's attorney was unaware that introduction of the first trial testimony was an option available to him, the judge's finding that counsel deliberately chose, for strategic or tactical reasons, not to exercise that option is unsupported by the record and cannot be sustained.

11. Plummer repeated his denials a decade later at the hearing on Long's § 23–110 motion. Moreover, even if Plummer had been in a position to assert a Fifth Amendment privilege, which he was not, he waived that privilege by testifying at Long's first trial. *Hale,* 361 A.2d at 216 n. 8. "The focus of a waiver inquiry is on whether the witness would have been exposed to a substantial incremental risk of incrimination if he had been required to testify further." *Johnson,* 746 A.2d at 356 (citations and internal quotation marks omitted). The relevant circumstances did not change between Long's two trials, and there is therefore nothing in the record to suggest that testifying at the second trial would have put Plummer at *any* incremental risk of self-incrimination.

Accordingly, defense counsel knew or should have known that at Long's second trial, Plummer could not successfully invoke his Fifth Amendment privilege—especially a *blanket* privilege. Nevertheless, Baer not only failed to contest Plummer's proposed claim of privilege, but he affirmatively advocated in favor of Plummer's right to assert it when Judge Shuker suggested that the privilege had been waived. To the extent that ten years later, the judge who presided at the motions hearing apparently accepted Baer's position, I cannot agree with her view that Plummer's rights under the Fifth Amendment would have been implicated if the defense had called him as a witness.

Long's attorney argues in her brief on appeal that trial counsel "inexplicably asserted a blanket privilege on Plummer's behalf ... and ignored settled law that would have permitted [counsel] to introduce into evidence Plummer's sworn testimony, if indeed the privilege was valid." Despite Baer's otherwise commendable defense of Long, I am constrained to agree with that assessment.

12. Because Plummer decided to invoke his privilege against self-incrimination, Long's attorney had the right to introduce at his client's second trial the testimony that Plummer had given at the first trial, (both the direct examination and the cross-examination). "In order for prior testimony to be admissible, it must appear (1) that direct testimony from the declarant is unavailable; (2) that the declarant, when giving the prior testimony, was under oath in a legal proceeding; (3) that the issues in the two proceedings are substantially similar; and (4) that the party against whom the testimony is now offered had an opportunity to cross examine the declarant at the earlier proceeding." *Dudley v. United States,* 715 A.2d 866, 867 (D.C.1998). Each of these four conditions was satisfied in this case, and no party has argued to the contrary.

Baer did testify at the hearing that "thinking back on it now," and "based on the cross-examination," he would probably be "pretty reluctant" to read Plummer's first trial testimony to the jury at the second trial. But Baer's assertion of reluctance ten years after the fact does not support a finding that he made a strategic or tactical decision at the time of trial—one that he obviously could not have made because he did not know that the choice was available to him. In her order, the judge also focused on the cross-examination at the first trial, finding that it was there "revealed" that allegations of a conspiracy between Tilghman's fellow-prisoners to harm or kill William Tilghman existed. The judge described this as "negative testimony" which led to what she characterized as Baer's "strategic decision" not to read Plummer's prior testimony to the jury. Moreover, the judge's description of the cross-examination of Plummer as "negative testimony" contradicts a rule of evidence which is explained to jurors at all criminal trials:

> Sometimes a lawyer's question suggests that something is a fact. Whether or not something is a fact depends on the witness' answer—not the lawyer's question. *A lawyer's question is not evidence.*

District of Columbia Standard Criminal Jury Instruction No. 1.07 (2005) (emphasis added); *see Jenkins v. United States*, 870 A.2d 27, 33 (D.C.2005) ("By reciting Standard Instruction [No.] 1.07, the trial court stated clearly that facts are established by a witness's answer, and not by a lawyer's question. This was a direct, balanced and neutral response to the jury's first question, as the law requires.").

In her order, the trial judge did not distinguish between *the questions* posed by the prosecutor, which were not evidence, and *the answers* given by the witness, which were. Thus, notwithstanding Plummer's unequivocal denial of the factual assumptions contained in the prosecutor's questions, the judge characterized Plummer's cross-examination as "negative testimony." [13] Given the rule that "[a] lawyer's question is not evidence," I cannot agree with the judge's characterization.

**13.** Counsel, and perhaps the judge, could plausibly believe that notwithstanding Instruction No. 1.07, the jury might assume that the prosecutor's questioning was based on facts that were known to the prosecution, even though these facts were not in evidence. Jurors are, however, presumed to follow the court's instructions. *See, e.g., Thompson v. United States*, 546 A.2d 414, 425 (D.C.1988). "[T]his is a crucial assumption, *Tennessee v. Street*, 471 U.S. 409, 415 [105 S.Ct. 2078, 85 L.Ed.2d 425] (1985), for our theory of trial depends on the jury's ability to do so. *Opper v. United States*, 348 U.S. 84, 95 [75 S.Ct. 158, 99 L.Ed. 101] (1954)." *Id.* If trial counsel in fact made a purported tactical decision because he believed that the court's instructions would be disregarded, he made no such claim at the hearing, and the judge made no such finding.

In some cases, it may be a legitimate and effective tactic for a prosecutor to pose questions to a defendant or a witness which contain the government's theory of the facts, in the hope and expectation that the jury will infer, from the defendant's demeanor in denying the allegations, that he or she is not being truthful. That, no doubt, is the basis for the practice, often used in British trials, of beginning a question to the witness with the words "I put it to you that ...," followed by a statement indicating the interrogator's theory. In this case, however, Long's attorney could have introduced a transcript of Plummer's testimony at the first trial without risking any adverse inference based on Plummer's demeanor, for the jury at the second trial would not have been able to observe Plummer. Moreover, and significantly, the first trial, at which questions of the "I put it to you" type were asked by the prosecutor, Long was not convicted.

The record thus discloses that, by his own admission, Long's trial attorney probably never even considered a course of action plainly available to him if Plummer invoked his privilege against self-incrimination, namely, to introduce into evidence and read to the jury Plummer's first trial testimony. Under the defense theory of the case, that testimony had contributed significantly to the prosecution's failure, at the first trial, to secure Long's conviction of the principal charges against him. In spite of Baer's spirited and competent defense of his client in other respects, I believe that his representation of Long in relation to this aspect of the case was constitutionally deficient, and that the trial judge's contrary findings are unsupported by the evidence and, in the respects that I have discussed, based on misapprehensions of law.

## C. *The prejudice prong*

### (1) *Background*

In addition to establishing that his counsel's performance was deficient, Long must prove that he suffered prejudice, *i.e.*, he must establish a reasonable probability that, but for his attorney's errors, the result of the second trial would have been different. *Strickland*, 466 U.S. at 687, 694, 104 S.Ct. 2052. Put another way, a defendant suffers prejudice, as that term is used in *Strickland*, when his counsel's errors are so serious that our confidence in the outcome of the trial has been undermined. *Id.* at 687, 104 S.Ct. 2052. In determining whether Long has made the necessary showing, a court "must consider both the gravity of the potential injury to his interest resulting from counsel's errors and the strength of the other evidence against him." *Mack v. United States*, 570 A.2d 777, 784 (D.C.1990).

Because the trial judge discerned no deficient performance on defense counsel's part in relation to counsel's failure to present Plummer's first trial testimony, she had no occasion to address, in the appropriate legal context, the question whether, if *Strickland*'s deficient performance prong *was* satisfied, Long proved that he had suffered prejudice in the *Strickland* sense. The judge did write that Long "experienced no prejudice" as a result of "(1) not having ... Mr. Hunter testify on his behalf during the [second] jury trial[ ]" or (2) "[Baer's] limiting the usage of Mr. Plummer['s] damaging testimony from the first jury trial." The judge's decision that Long failed to show prejudice, however, rested on two assumptions with which I am constrained to disagree; first, that Baer's failure, as a result of his conceded unfamiliarity with the applicable law, to present Plummer's testimony did not constitute deficient performance, and second, that Plummer's testimony at the first jury trial was "damaging" to Long (the judge having apparently failed to adhere to the principle that counsel's questions are not evidence). To the extent that the judge's view that Long was not prejudiced, contained in her Conclusions of Law, may nevertheless be considered a finding of fact, "findings induced by, or resulting from, a misapprehension of controlling substantive legal principles lose the insulation of [the clearly erroneous rule], and a judgment based thereon cannot stand." *Murphy v. McCloud*, 650 A.2d 202, 210 (D.C.1994) (quoting *Davis v. Parkhill-Goodloe Co.*, 302 F.2d 489, 491 (5th Cir. 1962)) (internal brackets and quotation marks omitted); *see also United States v. Singer Mfg. Co.*, 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963).

Accordingly, I am satisfied that the trial judge's order does not resolve the question whether Long has satisfied *Strickland*'s prejudice prong. Because this issue is not at all one-sided, I first address in some

detail the contentions of the parties and then explain my conclusions with respect to these contentions.

#### (2) *Long's position*

Long's argument that he suffered *Strickland* prejudice is capsulized in the following sentences in his counsel's brief:

> Michael Plummer's testimony was essential to Colie Long's defense. At the first trial, it had been the only evidence presented that directly countered the testimony of William Tilghman.
>
> * * *
>
> Since a jury presented with Plummer's testimony did not convict Mr. Long of first-degree murder while armed and two related offenses, it can be concluded that there was a reasonable probability that counsel's failure to provide the jury with Plummer's testimony contributed directly to Long's conviction.

In other words, according to Long, because his conviction at the second trial came about *after* Plummer's testimony was omitted from what had been Long's comparatively successful defense at his first trial, the unfavorable result of the second trial probably occurred *because* of that omission.

Standing alone, this contention, based primarily on the sequence of events, arguably proves too much. Indeed, it might fairly be viewed as embracing the *"post hoc ergo propter hoc"* fallacy.[14] In this case, however, Long correctly argues that the order in which the events occurred does not stand alone. Missing from the defense case at the second trial was testimony that a person other than Long—specifically, Tilghman—incriminated himself in a very major way by admitting (and

boasting) to Plummer, in the presence of others, that he, not Long, murdered Williamson, and that he had falsely placed the blame on Long.

Admissions and, in some instances, statements against penal interest, *see Laumer v. United States,* 409 A.2d 190 (D.C. 1979) (en banc), are received in evidence, as exceptions to the hearsay rule, because they are deemed reliable. In the absence of coercion, of which there is no evidence here, a person is not ordinarily expected to confess to a crime which he or she did not commit. "A confession, especially one that survives the multiple attacks that can be made on its admissibility, has traditionally been regarded as *extraordinarily reliable evidence* of the defendant's guilt," EDWARD W. CLEARY, McCORMICK ON EVIDENCE, § 144, at 364 (3d ed. 1984) (emphasis added), and thus, in many cases, as proof of an alternative suspect's innocence. The first Justice Harlan, writing for the Court in *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), stated the principle as follows:

> A confession, if freely and voluntarily made, is evidence of the most satisfactory character.... [It] is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt.... The presumption upon which weight is given to such evidence [is] that one who is innocent will not imperil his ... interests by an untrue statement.

*Id.* at 584–85, 4 S.Ct. 202.

"[N]o other statement is so much against interest as a confession of murder." *Donnelly v. United States,* 228 U.S. 243, 278, 33 S.Ct. 449, 57 L.Ed. 820 (1913) (Holmes, J., dissenting), quoted with approval by our en banc court in *Laumer,* 409 A.2d at 197. In *Ingram v. United*

---

**14.** This fallacious maxim is Latin for "after this, therefore because of this." A familiar illustration of its illogic is:

Roosters crow just before the sun rises. Therefore, roosters crowing causes the sun to rise.

*States,* 885 A.2d 257 (D.C.2005), we recognized, citing *Laumer,* that "a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect," *id.* at 263, and we applied this principle to a confession made by a third party to a criminal defendant's attorney, holding that it made no difference that the admission of guilt had not been made to a law enforcement officer. Given these authorities, which are surely consistent with common sense, I am of the opinion that testimony to the effect that someone other than Long (here Tilghman) freely confessed to killing the decedent, and falsely placing the blame on Long, constituted important and (if credited) potentially decisive evidence.[15]

To be sure, Plummer was certainly not an ideal witness. At the time of Long's second trial, Plummer was himself on trial, also for the second time, for an unrelated murder of which he was convicted a few days after Long's trial ended. But Plummer was also facing the murder charge when he testified at Long's *first* trial, albeit he had not yet been convicted, and the prosecution nevertheless failed to obtain a murder conviction of Long at that proceeding. Long's contention that the difference in result between his first and second trials was not attributable to coincidence,[16] but resulted from Baer's failure to present Plummer's testimony, is at least plausible. This is not to say, however, that the government's strikingly different assessment of Long's claim is implausible, for it is not;

indeed, it has been essentially accepted by my colleagues in the majority.

### (3) *The government's position*

According to the government, its success in securing convictions on the major charges at the second trial, but not at the first, had nothing to do with Plummer. The government points out that Plummer's testimony represented only a very brief portion of defense counsel's closing argument. In the government's view, it was the return of a superseding indictment between the first and second trials that explains the different outcome in the second. In essence, the government claims that it succeeded at the second trial, when the first resulted in a hung jury, because at the first trial, it was required to prove that Long was the shooter, while at the second trial, it was not.

Unlike the original indictment, the superseding indictment charged Long with conspiracy to commit armed first degree murder, as well as with the substantive murder itself. The government points to a note from the jury at the second trial in which the jurors posed the following question:

> If the jury finds that there was a conspiracy to commit murder between the defendant and Tilghman, and that *either* the defendant or Tilghman murdered Williamson, can the defendant be found guilty of first-degree murder while armed?

(Emphasis in original.) The judge gave a qualified affirmative response to this ques-

---

**15.** There are, however, exceptions to most rules, and not all confessions are reliable. In this case, Long admitted to the police, in a statement which the trial court suppressed, that he had shot Williamson, and Tilghman told an FBI agent, as well as Plummer, that *he* had fired the murder weapon. Both men thus confessed to committing the same criminal act.

**16.** "Coincidences happen, but an alternative explanation not based on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992).

tion, and a verdict of guilty was returned on the following morning. Emphasizing that the defense devoted little of its closing argument on behalf of Long to Plummer, the government dismisses as inconsequential Plummer's testimony that Tilghman admitted both that he shot the decedent and that he falsely placed the blame on Long.

At first blush, the government's argument appears to rest on a flawed premise. The government evidently now assumes that Long could not have been, or was unlikely to be, convicted at the first trial unless the jurors unanimously believed that he (and not Tilghman) fired the fatal shot. But according to District of Columbia law,

> [i]n prosecutions for any criminal offense all persons advising, inciting or conniving at an offense or aiding the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be.

D.C.Code § 22–1805 (2001). As Judge Learned Hand wrote for the court three quarters of a century ago, an aider and abettor is guilty as a principal if he "in some sort associate[s] himself with the venture . . . , participates in it as something he wishes to bring about, that he seek[s] by his actions to make it succeed." *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1936); *accord, Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); *Wilson–Bey v. United States,* 903 A.2d 818, 831 (D.C.2006) (en banc), *cert. denied,* 550 U.S. 933, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007); *English v. United States,* 25 A.3d 46, 52–53 (D.C. 2011).

Indeed, the government's own position at the first trial, as well as at the second, was that *both* Long and Tilghman were guilty of armed premeditated murder, regardless of which man pulled the trigger and fired the fatal shots. The First Count of the original indictment, returned by the grand jury at the government's behest on May 13, 1996, reads as follows:

> Colie L. Long, also known as "Meatball", *and another person whose identity is known to the Grand Jury,* within the District of Columbia, while armed with a firearm, that is, a pistol, with deliberate and premeditated malice, killed Ronald Williamson, by shooting him with a firearm, that is, a pistol, on or about March 19, 1996, thereby causing injuries from which Ronald Williamson died on or about March 19, 1996. (First Degree Murder While Armed (Premeditated), in violation of 22 D.C.Code, Sections 2401, 3202).

(Emphasis added.) It was thus the prosecution's theory that both men—Long and Tilghman (the latter being the man whose identity was known to the Grand Jury)— committed first-degree premeditated murder while armed, although only one of them could have fired the fatal shot. According to the government's own position, Long would have been guilty even if Tilghman was the shooter, so long as the prosecution proved beyond a reasonable doubt that Long aided and abetted him.

The government's contention that it was the absence of a conspiracy count that led to the failure to secure a murder conviction at Long's first trial becomes more plausible, however, in light of what appears, in retrospect, to have been a somewhat surprising ruling by the presiding judge. The prosecutor at that trial requested the judge to instruct the jury with respect to aiding and abetting. Although, in my view, the evidence warranted such

an instruction,[17] the judge declined to give it. When the prosecutor asked "[what] if [the jurors] believed the defense theory . . . that William Tilghman was the shooter," the judge responded: "Then they'll find [Long] not guilty." This exchange suggests that, if the first jury's view of the case was similar to that of the second jury, the lack of an instruction as to conspiracy or aiding and abetting may have significantly affected the outcome.

The government also argues that in light of the prosecutor's questioning of Plummer at Long's first trial regarding, *inter alia,* Plummer's alleged participation in theft from, threats to, and intimidation of Tilghman, the introduction of Plummer's first trial testimony would probably have done Long's prospects more harm than good. The government asserts that, at the second trial, it could have introduced additional evidence to support the alleged facts on which the prosecutor's questioning of Plummer had been based even if the defense had simply read Plummer's first trial testimony to the jury. The government did not present proof, other than Tilghman's evidence on rebuttal, substantiating the prosecutor's questioning either at Long's first trial or, ten years later, at the § 23–110 hearing, and the prosecution's presentation of Tilghman's rebuttal testimony did not enable the government to secure a conviction. Neither the trial court nor this court can ascertain with any measure of reliability what the prosecutor would have done at the second trial if Plummer's first trial testimony on direct and cross-examination had been read to the jury. All we know is that the government had two other opportunities to introduce additional evidence more credible than Tilghman's, that it did not do so on either occasion, and that the first trial resulted in a hung jury notwithstanding, Tilghman's rebuttal evidence.

(4) *The strength of the government's case*

In determining whether Long has shown prejudice as that term is used in *Strickland,* we must consider not only the "gravity of the potential injury" to the defense brought about by counsel's errors, but also "the strength of the other evidence against him." *Mack,* 570 A.2d at 784. This factor, too, fails in my view to tilt the scales overwhelmingly in either direction. Indeed, this court said as much in deciding Long's first appeal:

> The evidence of Long's guilt was substantial, but it was not without its weaknesses. As an admitted participant in the murder who was testifying against Long as part of a plea deal, Tilghman was of suspect credibility, and he was impeached with his statement to an FBI agent that he had fired the murder weapon and other prior inconsistent statements. Each of the other witnesses who identified Long was impeached as well—Wheeler admitted not knowing whether it was Long or Tilghman she saw, Thomas admitted having thought she was mistaken about Long, and Green told the police she could not

---

**17.** The government introduced evidence that Long awoke Tilghman and told him to "get the gun." The men walked together to the alley, with Tilghman carrying the pistol where they found Man–Man alone. Long told Tilghman to go ahead and "bust" Man–Man. Then, according to Tilghman, he hesitated, and Long took the pistol and shot the decedent. *See Long I,* 910 A.2d at 301–02 (describing evidence at second trial). Thus, even if the jurors disbelieved Tilghman's claim that Long did the actual shooting, there was evidently ample evidence that, if the remainder of Tilghman's account was true, Long "associate[d] himself with the venture" and "[sought] by his actions to make it succeed." *Peoni,* 100 F.2d at 402.

make a positive identification. Thus, as in *Rice* [*v. United States*, 580 A.2d 119, 123 (D.C.1990)], the government's case depended on witnesses "whose credibility a jury might have assessed differently" if it had heard the testimony proffered in the § 23–110 motion. *Id.* *Long I,* 910 A.2d at 310. In any event, the fact that the first prosecution resulted in a hung jury—albeit for reasons as to which the parties vigorously disagree—surely tilts in the direction of a conclusion that the government's case, while undoubtedly sufficient to support a finding of guilt, was not overwhelming.

(5) *Reasonable probability and "undermined confidence"*

For the reasons that I have discussed at some length, this is a not a one-sided case. Indeed, it has divided the court. I have no doubt that reasonable minds could, and do, legitimately differ as to whether Long has proved that he has been prejudiced in the *Strickland* sense. Nevertheless, I am of the opinion that in this case, defense counsel's failure to bring Plummer's first trial testimony to the attention of the jury at the second trial deprived Long of important and potentially decisive exculpatory evidence. One might reasonably reach the same conclusion even if the second trial had been Long's only trial, and if no comparison with the first trial (and its hung jury) could be included in the calculus. In any event, the different results of the two trials are not so astonishing when, at the trial at which the defense presented testimony that another man had confessed to the murder, the jurors did not convict, but, at the trial at which the defense presented no such evidence, the defendant was found guilty.

Under the regime of *Strickland,* Long was required to establish a "reasonable probability" that but for his counsel's deficient performance, the outcome of his second trial would have been more favorable to him. He did not, however, have to show by a preponderance of the evidence that counsel's deficient performance brought about his conviction. Ultimately, the test is whether counsel's error "undermine[d] confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

I am of the opinion that Long has made the requisite showing. "Confidence" is a strong word, and one which the Court in *Strickland* surely used advisedly. It is possible that the outcome of Long's trial would have been the same even if Plummer's first trial testimony had been presented to the jury, but I cannot say that I have *confidence* that this is so. Accordingly, I would reverse Long's convictions [18] because, albeit in only one isolated but nevertheless critical respect, he has been denied the effective assistance of counsel.

---

18. If I am correct that Long has satisfied *Strickland* 's deficient performance prong, one plausible disposition would be to remand the case to the trial court for a second time for a finding on the prejudice prong not based on a misapprehension as to deficient performance. No party has suggested this, however, and given the fact that the murder occurred some sixteen years ago, I do not suggest such an outcome.

I also note that Long's appellate counsel represents, and it appears to be undisputed, that the government offered Long a plea agreement under which he would have been released several years ago. Having denied his guilt and declined the offer, however, Long has spent almost half of his life in prison, serving a sentence of life without parole.